# EXHIBIT B

# STATE OF NORTH CAROLINA

File No. **18 CVS 5537**

_____ Guilford _____ County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

Name Of Plaintiff
Jackie Braswell, et al.

Address

City, State, Zip

**VERSUS**

## CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS**

G.S. 1A-1, Rules 3, 4

Name Of Defendant(s)
Colonial Pipeline Company, and Apex Companies, LLC

Date Original Summons Issued
05-25-2017

Date(s) Subsequent Summons(es) Issued

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Colonial Pipeline Company | Apex Companies, LLC |
| c/o Corporation Service Company | c/o Registered Agent Solutions, Inc. |
| 2626 Glenwood Avenue, Suite 550 | 176 Mine Lake Court, Suite 100 |
| Raleigh                NC   27608 | Raleigh                NC   27615-6417 |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)
Mona L. Wallace
Wallace & Graham, P.A.
525 North Main Street
Salisbury                NC   28144

Date Issued
5-25-18

Time
1:46  ☐ AM  ☒ PM

Signature

☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

---

☐ **ENDORSEMENT**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date Of Endorsement

Time
☐ AM  ☐ PM

Signature

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

---

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

FILED
2018 MAY 25 PM 4:46
GUILFORD CO., C.S.C.
BY_____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CVS- 5537

| | |
|---|---|
| JACKIE BRASWELL, JUDY BRASWELL, HAROLD COLLINS, BONNIE COLLINS, Individually and as Executor of the Estate of HOMER WADE YARBROUGH, HAYMON HICKS, PENNY HICKS, GINA MYERS SHAW, JAMES SLONE, DEBBIE SLONE, JERRY SMITH, KAREN SMITH, PAMELA LOVELESS, KATHY MILLER, JOEY SMITH and SHANIA SMITH, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| COLONIAL PIPELINE COMPANY, and APEX COMPANIES, LLC, | ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT
### (Jury Trial Demanded)

Plaintiffs, represented by undersigned counsel, complaining of the Defendants, allege and say as follows:

## I. INTRODUCTION.

1.     This action is brought by Plaintiffs, Jackie and Judy Braswell, Harold and Bonnie Collins, Haymon and Penny Hicks, James and Pamela Loveless, Jeffrey and Kathy Miller, Gina Myers Shaw, James and Debbie Slone, Jerry and Karen Smith, Joey and Shaina Smith, and Bonnie Collins as duly authorized Executor of the Estate of Homer Wade Yarbrough against the Defendants, Colonial Pipeline Company ("CPC") and Apex Companies, LLC ("Apex") regarding damage to real property, to the ability of North Carolina families to use and enjoy their properties,

1

and for environmental harm caused by the recurrent release of petroleum and other hazardous contaminants into the environment.

2.      The Plaintiffs are residents of Davidson County, North Carolina. During the pertinent times, they have resided on and used land in proximity to CPC's Lexington Booster Station, which is located at 667 Helmstetler Road in Lexington, North Carolina. The Lexington Station facilitates the transport of various hazardous fuel products throughout the east coast. Booster pumping stations maintain pressure and flow rates. CPC, on information and belief, managed and oversaw a significant amount of the operations from its central office located in Alpharetta, Georgia. Apex was retained by CPC to perform site assessment work.

3.      The Plaintiffs and their properties were directly exposed to and recurrently infiltrated by hazardous gases, chemicals, and industrial wastes, which caused damage to their properties and to the natural resources of the environment in and around the Plaintiffs' properties, causing Plaintiffs to incur loss of use and enjoyment of their property, loss of quality of life, significant contamination, and other harm and damages.

4.      Defendants' conduct caused, *inter alia*, the release, spill, and discharge of hazardous chemicals and industrial wastes from the Booster Station. Defendants' negligent pattern and practice of releasing petroleum and other contaminants into the environment and its failure to properly remediate contamination has directly led to the contamination of well water and surrounding property.

5.      Defendants continue to pump product throughout the line, and otherwise oversee, maintain and facilitate pipeline operations, at lucrative financial benefit, and yet Defendants have failed to take adequate steps to manage releases at the site. Defendants have failed to locate the precise locations of releases and thereby have failed to take appropriate steps to eliminate the

2

egregious contamination and other causes of nuisance, trespass and contamination affecting Plaintiffs. The Booster Station has impaired the Plaintiffs' use and enjoyment of their properties.

6. In addition, the presence of Defendants' ongoing releases has caused water-supply wells to be compromised. Property owners are restricted from using active wells that had been used previously for many years. Plaintiffs' inability to use their wells has interfered with Plaintiffs' outdoor activities and reduced their property values.

7. Further, Defendants' business activities necessitate trucks traveling up and down the streets outside of Plaintiffs' homes. Some of the streets surrounding Plaintiffs' homes are narrow, unpaved roads which would not otherwise be subject to high truck traffic and disturbance. Defendants' trucks travel by Plaintiffs' homes without prior notice causing noise and stirring dust. Defendants' trucks are a source of annoyance and affect the use and enjoyment of the Plaintiffs' property.

8. CPC is a large interstate pipeline company, delivering petroleum products, such as gasoline, kerosene, diesel fuel, and jet fuel, with a network extending from Houston, Texas to Linden, New Jersey. CPC crosses and/or has operations and infrastructure in thirteen (13) states, spanning more than 5,500 miles, connecting twenty-nine (29) refineries located on the Gulf Coast to two hundred and seventy (270) marketing terminals. CPC owns and operates the world's largest refined liquid petroleum products pipeline.

9. Apex was previously retained by Colonial to assess and manage environmental issues related to water and ground resources, business facilities, and air quality at the Booster Station. Among other things, during the pertinent times, CPC retained Apex to conduct a Comprehensive Site Assessment ("CSA") of the Booster Station.

3

10.     Defendants named herein contributed to cause the below-described incidents and injuries and are jointly and severally liable for the continuing damage and harm. As described below, Plaintiffs allege claims both for damages and injunctive relief.

## II. PARTIES & JURISDICTION.

### A.     Plaintiffs.

11.     Plaintiffs Jackie D. Braswell resides at 517 Helmstetler Road, Lexington, North Carolina, Davidson County.

12.     Plaintiffs Judy Braswell resides at 517 Helmstetler Road, Lexington, North Carolina, Davidson County.

13.     Plaintiffs Harold Collins resides at 401 Helmstetler Road, Lexington, North Carolina, Davidson County.

14.     Plaintiffs Bonnie Collins resides at 401 Helmstetler Road, Lexington, North Carolina, Davidson County. Plaintiff Bonnie Collins brings this claim on her own behalf and as the duly authorized Executor of the Estate of Homer Wade Yarbrough, who during some or all pertinent times owned and/or resides at 247 Yarbrough Drive, Lexington, North Carolina, Davidson County.

15.     Plaintiffs Haymon Hicks resides at 206 Yarborough Drive, Lexington, North Carolina, Davidson County.

16.     Plaintiffs Penny Hicks resides at 206 Yarborough Drive, Lexington, North Carolina, Davidson County.

17.     Plaintiffs James Loveless resides at 286 Matthew Drive, Lexington, North Carolina, in Davidson County.

4

18.     Plaintiffs Pamela Loveless resides at 286 Matthew Drive, Lexington, North Carolina, in Davidson County and Pamela Loveless is also a joint property owner of 551 Helmstetler Road, Lexington, North Carolina, in Davidson County.

19.     Plaintiffs Jeffrey Miller resides at 398 Matthew Drive and Kathy Miller is a joint property owner of 551 Helmstetler Road, Lexington, North Carolina, in Davidson County.

20.     Plaintiffs Kathy Miller resides at 398 Matthew Drive and Kathy Miller is a joint property owner of 551 Helmstetler Road, Lexington, North Carolina, in Davidson County.

21.     Plaintiffs Jerry Smith resides at 321 Matthew Drive and Karen Smith is a joint property owner of 551 Helmstetler Road, Lexington, North Carolina, in Davidson County.

22.     Plaintiffs Karen Smith resides at 321 Matthew Drive and Karen Smith is a joint property owner of 551 Helmstetler Road, Lexington, North Carolina, in Davidson County.

23.     Plaintiff Gina Myers Shaw is a resident of 2887 Yadkin College Road, Lexington, North Carolina, Davidson County.

24.     Plaintiffs James Slone resides at 247 Yarborough Drive, Lexington, North Carolina, Davidson County.

25.     Plaintiffs Debbie Slone resides at 247 Yarborough Drive, Lexington, North Carolina, Davidson County.

26.     Plaintiffs Joey Smith resides at 676 Helmstetler Road, Lexington, North Carolina, Davidson County.

27.     Plaintiffs Shania Smith resides at 676 Helmstetler Road, Lexington, North Carolina, Davidson County.

5

**B. Defendants.**

28.     Upon information and belief, Defendant CPC is a corporation existing under the laws of the State of Delaware, with a principal office located at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 3009. It may be served by process at that address, or through its registered agent, Corporation Service Company, located at Bank of America Center, 16th Floor, 1111 East Main Street, Richmond, Virginia. Defendant has a North Carolina facility address at 411 Gallimore Dairy Rd, Greensboro, which oversees a 300 acre tank farm on Gallimore Dairy Road, which is the central North Carolina pipeline infrastructure that also includes the subject Booster Station. Significant quantities (barrels per day) of lucrative, environmentally-toxic commercial gas product move along Defendant's network including Line 01 which begins in Houston, Texas and terminates in Greensboro, North Carolina. A main line serving the Northeast begins in Greensboro, North Carolina and serves the Philadelphia, New, Jersey and New York markets.

29.     Upon information and belief, Defendant Apex is a corporation existing under the laws of the State of Delaware, with its principal office located at 15850 Crabbs Branch Way, Suite 200, Rockville, Maryland 20855-2610. It may be served by process at that address, or through its registered agent, Registered Agent Solutions, Inc., located at 176 Mine Lake Court, Suite 100, Raleigh, North Carolina 27615-6417. Apex is licensed to provide consulting and engineering services in North Carolina.

**III. JURISDICTION AND VENUE.**

30.     This Court has subject matter jurisdiction.

31.     The Court has personal jurisdiction over the parties.

32.     Venue is proper in this County.

6

## IV. FACTS.

33.    Plaintiffs bring this lawsuit against Defendants as rural homeowners and property owners who are but the latest victims of a pattern and practice of environmental contamination, negligent and willful acts and omissions, failure to report releases, and failure to remediate affected residential properties whom are directly affected by the acts and omissions of Defendants.

### A.    Background on Colonial Pipeline.

34.    CPC was founded in 1961. Once founded, the company began construction of a pipeline network, which began in 1962. The pipeline was expanded over time and today is a system in the vicinity of 5,500-miles (8,850-km) long, extending from Houston, Texas to Linden, New Jersey.

35.    Today, CPC is the largest-volume pipeline transporter of refined petroleum products in the world, moving millions of gallons of petroleum products each day through an underground pipeline that stretches from Port Arthur, Texas, to Linden, N.J., passing through Louisiana, Mississippi, Alabama, Georgia, Tennessee, South Carolina, North Carolina, Virginia, District of Columbia, Maryland, and Pennsylvania.

36.    Below is a diagram of the system from the company website:

7



37.    CPC's refined products pipeline system carries millions of barrels of gasoline, diesel and jet fuel between the Gulf Coast and the New York Harbor area. As can be seen from the map North Carolina is right in the middle of its pipeline network. The centrality of the Greensboro location is evident from the manner in which the part of the pipeline that splits off east toward the Raleigh area connects to the main body at Greensboro.

38.    Colonial Pipeline Company's national headquarters location is in Alpharetta, Georgia. It is a privately-held company. When it was originally founded in 1961, nine oil companies shared ownership. Today, CPC is owned by the following five entities: 1) CDPQ Colonial Partners, L.P.; 2) IFM (US) Colonial Pipeline 2, LLC; 3) KKR-Keats Pipeline Investors, L.P.; 4) Koch Capital Investments Company, LLC; and 5) Shell Pipeline Company, LP. In short, its owners include some of the largest corporations in the United States.

8

## B.   Background on Booster Stations.

39.     In recent years, CPC has represented to federal regulators and others that the use of its pipeline by shippers, i.e., companies that ship oil on the pipeline, has increased due to expanded production at Gulf Coast refineries.

40.     For example, during the 2010 to 2014 time period, CPC stated that its system was running at capacity, that its main lines were fully allocated and in fact, it even had to impose on its shippers certain volume reductions.

41.     To try to alleviate the problem, CPC sought to engage in various small-scale expansions, but found that its ability to add capacity through incremental measures was diminishing.

42.     This overburdened system puts great strain on its constituent parts.  One of those parts consists of the booster stations.

43.     As noted, the pipeline is thousands of miles long.  As it carries the crude oil and other petroleum products to destinations throughout the relevant states, the pumping or propulsive force of the liquid in the lines diminishes.  While the product begins its journey through the pipeline with force, it loses forward momentum over distance.

44.     To overcome this fact of physics and engineering, pumping stations or booster stations are positioned throughout the length of the pipeline to adjust the pressure, keep the product moving, and monitor flow and other information.

45.     These stations increase the through-put of the pipeline. The locations of these stations depends on factors such as where the network joins together or splits off into branches, and where there are geographical features such as elevated hills.

9

46.     There are a number of different types of pumps that can be found in the pumping stations. Pumping stations may also house booster pumps, which move product from the storage tanks at the station into the main line. The purpose of a booster station is to increase the pressure of oil or other product received through a main pipeline to transmit it to the next station or terminal. These stations contain intricate equipment and without continuous investment of time and resources, the equipment breaks down and leaks.

47.     Furthermore, due to North Carolina's central location in the pipelineextension, North Carolina booster stations are subjected to strenuous engineering demands to ensure product momentum.

48.     Where elements of a pipeline are shallowly covered by earth, or are exposed and aboveground, there is a greater danger of system corrosion, breakdowns, leaks, spills, releases and emissions. A booster station, by design, includes aboveground features and fixtures.

49.     Unlike other parts of the pipeline, a booster station requires periodic adjustment and manipulation of equipment and parts by workers. Booster and pumping stations have a greater danger of incurring mechanical damage and operator error.

C.     **Background on CPC Lexington Facility.**

50.     The CPC facility at issue herein is its booster station located at 667 Helmstetler Rd, Lexington, NC 27295. Below is an aerial view of the vicinity from Google Earth:

10



51.     The image below reflects the approximate locations of some, but not all of the homes and properties of the Plaintiffs herein:



11

52.     As seen above, these properties are located close to the Booster Station.

53.     The Booster Station facilitates the transport of petroleum fuel products throughout the east coast.

54.     The area surrounding the Booster Station is used mainly for residential and agricultural purposes.

55.     The Booster Station is positioned between the Kannapolis Station and the Greensboro Junction Station and its main purpose is to adjust pressure, pump product along the line, and monitor flow and other information about the transmittal of product.

56.     Upon information and belief, CPC documents indicate the the Booster Station had four prior releases dating back to 1989. However, to date, the Plaintiffs have not been able to confirm that CPC prepared or transmitted any appropriate site reports. Accordingly, the precise location of the releases remains unknown by Plaintiffs.

57.     On April 10, 2013, a petroleum release occurred at the Booster Station. Approximately five hundred (500) gallons of hydraulic fluid was released to the soil in the manifold area when an aboveground one-inch central hydraulic line failed.

58.     Upon information and belief, when that spill occurred, CPC retained Apex to engage in certain remedial and remediation efforts.

59.     During the pertinent times, Apex uncovered evidence of one or more prior spills. However, upon information and belief, no person or company was able to identify or locate any site reports pertaining to historical releases of contaminants at the Booster Station.

60.     Ultimately, in the aftermath of the 2013 spill, the Davidson County Fire Department reported fluid spraying from the Booster Station to CPC. CPC was required to take action in

12

response to the same. Among other things, CPC was required to submit a Comprehensive Site Assessment to the North Carolina Department of Environmental Quality ("NCDEQ").

61.     CPC retained the services of Apex to conduct a site assessment report. Excavation activities were completed to remove the source area. However, soils remained containing constituents of concern ("COCs") above the North Carolina regulatory standards, known as the "2L" and "2B" standards.

62.     In addition, contaminants were measured which exceeded Soil-to-Groundwater maximum soil contaminant concentrations ("MSCCs"), as well as Industrial Health Based Standards. These COCs consisted of benzene, toluene, ethylbenzene, xylenes, and naphthalene. Dichloromethane was also detected above Gross Contamination Levels ("GCL"). Fourteen out of the twenty-one monitoring wells showed results that exceeded 2L and 2B standards. These petroleum byproducts are hazardous chemicals that are carcinogenic and toxic.

63.     A total of twenty-one soil samples were collected by Apex on April 24, 2013, which were subsequently analyzed by Pace Analytical Services, Inc. ("Pace").

64.     The total petroleum hydrocarbon diesel range organics ("TPH-DRO") in the twenty-one soil samples ranged from 134 milligrams per kilogram (mg/kg) to 16,400 mg/kg. All of these detections exceeded the NCDEQ action level of 10 mg/kg.

65.     Additional samples were collected on May 22, 2013 at a new excavation site. Nine soil samples exhibited TPH-DRO concentrations ranging from 27.6 mg/kg to 32,400 mg/kg. All of these exceeded NCDEQ's permitted level of 10 mg/kg.

66.     The highest levels were observed on the southern side of the manifold area. These highly elevated concentrations in normal operations would not have been expected in this area and at the depths encountered.

13

67. The soil had an odor more consistent with a tar-like substance and testing revealed high levels of contaminants in the surrounding soil. Due to the relatively low migration characteristics of hydraulic oils, it was determined that significant, unreported historical spills had occurred at the Booster Station.

68. Alarmingly, Apex was unable to identify any site reports pertaining to these historical releases at the Booster Station despite CPC's duty and obligation to monitor and document events at its booster stations diligently and to report and notify regulatory agencies and other stakeholders of issues of concern and contaminant releases.

69. Never during the pertinent times did CPC alert nearby Plaintiff property owners of the releases of contaminants so as to allow them to take potential steps to safeguard their families, homes, and personal property.

70. CPC's conduct was made more egregious by the presence of nine water supply wells within 1,500 feet of the source of the release.

71. Below are "before and after" photos of the site. The top image dates back to 1993. The bottom one is recent. As can be seen, as far back as 1993, there were already homes located in the area. Indeed, there were homes located there dating back to even before the Booster Station was ever built. During all the years of its operation, the Defendant has been well aware of the nearby presence of families and owners of private property.

14





15

72.     CPC has been dilatory, recalcitrant, and unreasonable in its handling of the chemical spills located at the Booster Station and surrounding properties remain inadequately remediated years after CPC negligently released 500 gallons of hazardous chemicals.

73.     During the pertinent times, Defendants have failed to promptly and thoroughly remediate Plaintiffs' properties, including but not limited to the fact that one or both of Defendants have:

    a.  Failed to take adequate measures to remediate the contaminated water and soil affected by the historic spills;

    b.  Failed to adequately inform Plaintiffs about the migrating contamination and failed to accurately explain the significant amounts of contaminants found in the area;

    c.  Failed to submit site reports to NCDEQ even though four previous releases were identified to have occurred at the Facility, and the precise locations of the releases remain unknown;

    d.  Failed to submit a CSA Report addendum in accordance with 15A NCAC 2L .0106(c) and (g) to the UST Section of NCDEQ within 90 days of receipt of the Notice of Regulatory Requirements dated August 23, 2013;

    e.  Failed to take appropriate actions after having been sanctioned with a Notice of Violation of 15A NCAC Subchapter 2L Correction Action regulations on January 31, 2018 by the NCDEQ;

    f.  Failed to submit a CSA Report addendum within fifteen (15) days after receiving the Notice of Violation and advised the NCDEQ that a report would not be submitted until February 14, 2018 due to failure to accumulate all necessary sampling;

    g.  Failed to submit the CSA Report addendum until February 15, 2018, which report itself stated that soils still remained which contained COCs at concentrations exceeding soil-to-groundwater MSCCs as well as Industrial Health Based Standards;

    h.  Failed to take action so that to this day soils containing COCs at concentrations exceeding soil-to-groundwater MSCCs and industrial/commercial MSCC concentrations would not remain on site;

    i.  Failing to undertake other appropriate remedial actions in light of the fact that further excavation became not feasible due to the extent of contamination on the

16

properties, and in light of the fact that COCs were also detected in other areas and bedrock at concentrations exceeding the 2L and/or ten times the 2B standards; and

j.  Failed to timely, properly, or adequately act in such other respects as the evidence may show at trial.

74.     To date, Defendants have failed to properly remediate the egregious and migrating contamination surrounding the Booster Station.

75.     Five contaminants were detected in the surface water samples above laboratory detection limits during a July 2017 sampling event.

76.     Two contaminants were detected in the surface water samples above laboratory detection limits during a December 2017 sampling event.  They were benzene and 1,2 dichloromethane.

77.     A total of 15 COCs were detected in the water supply wells during a December 2017 sampling event and levels at that time exceeded the applicable 2L standards.

78.     Upon information and belief, for reasons that are at this time not known, as of the date of this filing Apex is no longer retained by CPC.

79.     As of the date of this filing, upon information and belief, CPC still has not determined where the releases are occurring along the pipeline and have failed to delineate the contamination plume, despite the danger to families and their private property.

**D.      Additional background on the Plaintiffs.**

80.     During the pertinent times, the Plaintiffs have suffered, and continue to suffer injury, as a direct result of the Booster Station's reported and unreported releases.  CPC continues to pump product through the pipeline.  Releases continue to occur and contaminate surrounding residential properties.

17

81.     Due to the Defendants' failure to identify and control the release sites, the product pumped through the pipeline has recurrently released contaminants into the environment. Defendants have refused to identify the release sites or to invest the resources necessary to mitigate the releases, despite their financial capacity and ability to do so.

82.     In addition, one or more Plaintiffs have previously notified CPC of a problem with one of the units at the station, which caused loud and intrusive noise, while product was being delivered to the Greensboro facility.

83.     Defendants have withheld significant information regarding the contamination found on Plaintiffs' properties and have not properly provided notice to all Plaintiffs of the quantity and duration of releases and harms. Plaintiffs have suffered stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, gardening, and lawn chores, amongst numerous other harms.

84.     Plaintiffs have employed measures to protect their property from the contamination, noise, disruption and nuisance the Booster Station causes. Some Plaitniffs have abandoned water supply wells, repaired basements due to the damage caused to the foundation by the shaking of the pipeline, and sought other means and methods to deal with numerous other harms.

85.     Plaintiffs Jackie and Judy Braswell own property located at 517 Helmstetler Road in Lexington, North Carolina. Their property is directly south of the Booster Station and is directly adjacent to 551 Helmstetler Road.

86.     Their home on the property was connected to Davidson County water when the county put water lines down in the area. However, the personal well on the property has always been used to water a family garden located on the property. Mrs. Braswell is the daughter of Van

18

D. Smith, who also used the well on this property to water the garden during his lifetime. Mrs. Braswell has consumed produce from this garden since childhood. Mr. and Mrs. Braswell have continued to use the garden during their ownership of the property. Mr. and Mrs. Braswell have two children, Allen and Brian Braswell. Now, these Plaintiffs are concerned and cannot enjoy their garden as before.

87.    Mr. and Mrs. Braswell take pride in their home and are concerned and have suffered a loss of use and enjoyment and property value as a direct and proximate result of the Defendants' conduct, actions and inactions.

88.    Plaintiffs Harold and Bonnie Collins reside at 401 Helmstetler Road. This property is directly adjacent to Mr. and Mrs. Braswell's property and is south of the Booster Station.

89.    They have longstanding roots in the community. Mrs. Collins visited and stayed with her father at 247 Yarborough Drive until she was twelve years old. Mrs. Collins would visit her father every other weekend from 1974-1978. Subsequently, in the late 1990's, Mr. and Mrs. Collins also lived with Mr. Yarbrough for six months while their home was being built. The home located on 247 Yarbrough Drive utilized well water until the mid to late 1990s. Mrs. Collins would drink and use the well water located at her father's residence. Mr. and Mrs. Collins have one son, Matthew Collins.

90.    Mr. and Mrs. Collins take pride in their home and are concerned and have suffered a loss of use and enjoyment and property value as a direct and proximate result of the Defendants' conduct, actions and inactions.

91.    Plaintiffs Haymon and Penny Hicks own property located at 206 Yarborough Drive, Lexington, North Carolina. Based on data provided by the Defendants, this property has existing environmental concerns, including but not limited to, deep groundwater contamination.

19

92.     Plaintiffs James and Pam Loveless own property located at 286 Matthew Drive, Lexington, North Carolina. Mrs. Pam Loveless jointly owns 551 Helmstetler Road with her sisters Kathy Miller and Karen Smith.

93.     Sampling results from February 26, 2016, indicate that there are petroleum fuel-related contaminants in the groundwater beneath the property located at 551 Helmstetler Road. Sampling results exhibited benzene levels at 1600 ug/L when the permitted level is 1.0 ug/L. Subsequently, sample results from March 28, 2017 confirm that there are petroleum fuel-related contaminants in the groundwater beneath 551 Helmstetler Road. These contaminants exceed the North Carolina 2L Groundwater Quality Standards.

94.     Plaintiffs Jeff and Kathy Miller own property located at 398 Matthew Drive, Lexington, North Carolina. Mrs. Miller lived at 551 Helmstetler Road until she and Mr. Miller got married in 1978.

95.     Sampling results from February 26, 2016, indicate that there are petroleum fuel-related contaminants in the groundwater beneath the property located at 551 Helmstetler Road. Sampling results exhibited benzene levels at 1600 ug/L when the permitted level is 1.0 ug/L. Subsequently, sample results from March 28, 2017 confirm that there are petroleum fuel-related contaminants in the groundwater beneath 551 Helmstetler Road. These contaminants exceed the North Carolina 2L Groundwater Quality Standards.

96.     Plaintiffs Jerry and Karen Smith own property located on 321 Matthew Drive, Lexington, North Carolina. Mr. and Mrs. Smith also own a separate parcel of land with three separate addresses located on the parcel. The tract of land with the trailer park on it is 3.80 acres. Mr. and Mrs. Smith own 156 Matthew Drive, but the trailer and lot are currently rented to another individual. Secondly, a separate individual, who recently passed away, owns the trailer located at

20

166 Matthew Drive while Mr. and Mrs. Smith own the lot. The son currently lives there and rents the lot space from Mr. and Mrs. Smith. Lastly, Mr. Bobby Stacey rents the lot space found at 579 Helmstetler Road from Mr. and Mrs. Smith. Mr. and Mrs. Smith have three children; Christy Potter, Matt Smith, and Jennifer Moretz.

97.    Like the other Plaintiffs herein, Mr. and Mrs. Smith have suffered injury as a result of the Defendants' improper actions and inactions.

98.    Mrs. Smith, Mrs. Miller, and Mrs. Loveless are the daughters of Matthew and Iris "Jody" Smith. Mrs. Pam Loveless, Mrs. Kathy Miller and Mrs. Karen Smith jointly own 551 Helmstetler Road. The property was inherited from their mother upon her death in 2017. A family garden is located on the property and the garden has been used for many, many years. The well's primary purpose was to water the vegetables grown in the family garden. The family garden was used every year since the women were born. Vegetables, such as tomatoes, Irish potatoes, corn, squash, onions, carrots, collards, and turnip greens, from the garden were shared with family and friends. The well water was used to water the garden.

99.    Sampling results from March 28, 2017 confirmed that there are petroleum fuel-related compounds in the groundwater beneath 551 Helmstetler Road at concentrations exceeding the North Carolina 2L Groundwater Quality Standards. These compounds were approximately 40 feet below the ground surface. Plaintiffs grew up using and drinking the well water and thereby came into direct contact with the water. The sampling results showed benzene levels at 1,600 ug/L whereas the permitted level is 1.0 ug/L.

100.    Plaintiff Gina Myers Shaw resides at 2887 Yadkin College Road in Lexington, North Carolina, however she currently owns undeveloped land directly across the street from the Booster Station on Helmstetler Road, and has been directly affected by the ongoing releases. This

21

property is inside the contamination plume. CPC has previously purchased the undeveloped properties on each side of Ms. Shaw's property. On information and belief, CPC has purchased one or more nearby properties due to the known contamination and danger.

101. Plaintiffs James and Debbie Slone own property located at 247 Yarborough Drive, Lexington, North Carolina. Mr. and Mrs. Slone have two wells; one is active and the other well was abandoned due to the underground contamination. The active well is currently used to water their garden and to hydrate their animals.

102. Mr. and Mrs. Slone received a letter from Colonial on December 4, 2017 stating that sampling results from their water supply well (identified as WSW-16B) indicated that there were petroleum fuel-related compounds in the groundwater beneath their property at concentrations exceeding the 2L Groundwater Drinking Water Quality Standards. The groundwater containing these compounds was found approximately 22 feet below the ground surface.

103. Plaintiffs Joey and Shania Smith live at 676 Helmstetler Road. Joey is the son of Larry Van Smith, whom was the brother of Judy Braswell. Based on data provided by the Defendants, this property has existing environmental concerns, including but not limited to, shallow and deep water contamination, potential vapor intrusion concerns, and furthermore, the pipeline crosses their property

104. Plaintiff Homer Wade Yarbrough during pertinent times lived at 247 Yarborough Drive in Lexington, North Carolina. The home located on the property was built in 1974 and he lived there until 1978. Mr. Yarbrough drank the well water, watered his garden with the well water, and hydrated livestock with the well water. Bonnie Collins is the daughter of Mr. Yarbrough and the Executor of his estate.

22

E.     **Pattern and practice of contaminant spills and emissions.**

105.    There have been nearly 200 known CPC contamination events and spills during the period from 1968 through 1996 based on a review of records of the United States Department of Transportation's Office of Pipeline Safety. These included a number of high-volume spills.

106.    An additional number of unreported spills and incidents have also likely occurred, including one or more on information and belief indicated by the company's internal corporate records and electronic data.

107.    On or about September 2, 1970, Jacksonville, Maryland residents detected gasoline odors and traces of gasoline in a creek. CPC was notified and the leak point was found four days later. The failure resulted in a release of an estimated 30,186 gallons (718 barrels) of gasoline and kerosene.

108.    On or about December 19, 1991, CPC's Line 2 pipeline ruptured in Simpsonville, South Carolina pump station. More than 500,000 gallons (13,100 gallons) of diesel fuel was released into Durbin Creek which environmentally damaged 26 miles of waterway. Clinton and Whitmire were forced to use alternative water supplies.

109.    On or about March 28, 1993, CPC's pipeline ruptured creating a geyser that sprayed diesel fuel more than 75 feet into the air. The diesel fuel coated overhead power lines, adjacent trees, and flowed into storm water management ponds, and overland through a network of storm sewer pipes entering the Sugarland Run Creek.

110.    On or about October 1994, CPC's gasoline and diesel pipelines failed and ruptured in the Houston area.

23

111. On June 29, 1995, a release occurred at the Kannapolis Booster Station in Mooresville, North Carolina. CPC reported it discovered a past release while conducting a site assessment.

112. On or about June 26, 1996, CPC's pipeline ruptured near Fork Shoals, South Carolina. The pipeline released about 957,600 US gallons (3,625,000 L) of fuel oil. The release polluted a 34-mile stretch causing significant environmental damage. Floating oil also extended the compounds about 23 miles downriver killing approximately 35,000 fish and other aquatic wildlife. The estimated cost to cleanup and settlement with the State of South Carolina was $20.5 million dollars due to CPC's clear negligence, operator confusion and mismanagement of the pipeline.

113. On or about April 23, 1996, CPC's pipeline ruptured and released approximately 33 barrels (1386 gallons) of gasoline into an unnamed creek near Blacksburg, South Carolina. The release occurred as a result of a crack located at two overlapping dents on the pipe.

114. On or about May 17, 1996, CPC's pipeline released approximately 1.2 barrels (50 gallons) of gasoline in Greensboro, North Carolina.

115. On May 30, 1997, CPC released around 18,900 US gallons (72,000 L) of gasoline into a creek and adjoining shoreline in Athens, Georgia. This spill resulted from CPC's own calculation error and it did not have a procedure in place to confirm such calculations.

116. On or about December 2, 1997, a leak in the pipeline released more than 10,000 barrels (420,000 gallons) of gasoline in St. Helena Parish, Louisiana. The release caused extensive soil and groundwater contamination and within two years a plume of gasoline extended over fourteen (14) acres on the surface and more than sixty (60) acres total were contaminated.

24

117.    On or about February 1999, CPC released approximately 53,550 gallons (1275 barrels) of fuel oil. The release polluted around eight miles of the Tennessee River and the fuel saturated ten (10) homes, causing evacuation of six homes. At the time of the release, CPC received information about a reduction in pressure, which indicated a leak, CPC continued to send fuel into the pipeline until the local Fire Department notified CPC that it was releasing into Goose Creek.

118.    On or about May 19, 2000, CPC's pipeline release kerosene giving rise to a sheen about 40 feet by 40 feet in a pond in Greensboro, North Carolina.

119.    On or about June 8, 2000, a 24-hour report documented a second release at the Kannapolis Booster Station located in Mooresville, North Carolina. Approximately, five hundred (500) gallons of gasoline was released from a crack in ½-inch line. Approximately, four hundred and eighty (480) gallons of free product was recovered.

120.    On or about February 8, 2006, a hydraulic oil release was reported and an estimated sixty-two (62) gallons of hydraulic oil was released from a relief valve. Nine tons of soil were excavated.

121.    On October 23, 2012, CPC released 500 gallons of gasoline in Chattanooga, Tennessee.

122.    On or about March 13, 2015, an above-ground gasket on the discharge valve of the Kannapolis Booster Station failed resulting in the release of approximately nine hundred and twenty (920) gallons of diesel to the ground surface. Approximately sixty hundred and twenty (620) gallons of free product was recovered. Subsequently, during site remediation on August 13, 2015, a nipple was struck by a piece of equipment, and resulted in the release of approximately five thousand (5,000) gallons of diesel fuel.

25

123. On September 21, 2015, a release caused approximately 4,000 gallons of hydrocarbon product to leak in Centreville, Virginia over the course of two weeks. Product was removed from a retention pond and a townhome community.

124. On September 9, 2016, CPC released approximately 252,000 gallons of gasoline. This release required CPC to have a partial shutdown of the pipeline and threatened the southeastern United States with a fuel shortage. This release was said to be CPC's biggest spill in two decades.

125. On October 31, 2016, CPC's pipeline exploded after the pipeline was damaged during repairs.

126. On November 28, 2000, the United States filed a complaint against CPC for Clean Water Act violations due to CPC's gross negligence. CPC had seven spills in the late 1990's, three of which caused significant environmental damage and caused CPC to pay $34 million, which was the largest civil penalty a company has paid in EPA history. *See United States v. Colonial Pipeline Co.*, Case No. 1:00-cv-03142-JTC (N.D. Ga.), Consent Decree filed June 16, 2003.

127. According the United States Department of Justice press release dated April 1, 2003, regarding the Consent Decree, one or more of the spills forming the basis of the penalty occurred in North Carolina.

128. Under the terms of the Consent Decree, CPC was obligated among other things to inspect its corrosion prevention system along the entire pipeline system every five years; repair problems detected in the corrosion prevention system to meet the standards developed by the National Association of Corrosion Engineers, and survey and inspect the pipeline where it crosses water, and address areas of the pipeline that are exposed or insufficiently buried.

26

129.     Under that Consent Decree, CPC was obligated to amend its written "Integrity Management Program," so as to "designate its entire Pipeline as pipeline segments that could affect a High Consequence Area." Consent Decree, ¶ 8.

130.     Pursuant to 49 C.F.R. §§ 195.450 and .452, high consequence areas are designated to require special protection due to the dangers. For example, one example of a high consequence area would be an area populated by homeowners and their families, such as in this matter.

131.     Also under the Consent Decree, CPC was obligated to improve the diligence of its inspections and surveys of pipeline fixtures as reflected by its Maintenance Manual. Consent Decree, ¶ 9.

132.     In addition, under the Consent Decree, CPC promised that it would retain one or more specialists experienced in pipeline repair and maintenance, including but not limited to, assessment and repair of defects, close interval surveys and maintenance of protection systems, and exposed and shallow pipe remediation, and have those consultants undertake diligent inspections. Consent Decree, Section VII. However, CPC in none of its activities directly or through consultants discovered or reported the evidence history of releases at the Booster Station, nor took effective action to prevent the latest release.

133.     Collectively four of CPC's prior releases permitted a total of 422,150 gallons of gasoline or kerosene into the environment, for which CPC was penalized.

134.     Historically, over the course of approximately 50 years, CPC has had additional releases from its pipelines, which continues to damage and affect surrounding properties and waters.

135.     Most recently, on March 16, 2018, CPC agreed to a $3.3 million settlement with Alabama to resolve claims related to gasoline pipeline ruptures and other releases in the state

27

including in September and October 2026 inn Shelby County, after an investigation by the Alabama attorney general's office and the Alabama Department of Environmental Management.

136. The types of gasolines and fuels transported by CPC are among the most toxic of all petroleum products. Due to its toxicity, drinking water and personal well usage may be impaired by spilled oil from contamination or cause restrictions in use. These oil spills into water and surrounding residential properties can further harm the public by affecting their use and enjoyment of their property.

137. Surrounding properties may require years to recover from environmental harm caused by Colonial's releases. Because of the extensive geographic coverage of CPC's pipeline system, the volume of products transported, and the proximity of the pipeline to innocent residential property owners, these property owners are at an elevated risk from CPC's pipeline releases. Furthermore, this pattern and practice of past incidents and contamination from CPC facilities combine to put the company on notice of the dangers and reflect that Defendant's ongoing conduct is reckless and willful.

## FIRST CLAIM FOR RELIEF
### Violation of Oil Pollution and Hazardous Substances Control Act of 1978
### (Defendant CPC)

138. Plaintiffs re-allege and incorporate herein by reference the allegations contained in preceding paragraphs as though same are fully set forth herein.

139. This claim is brought under the North Carolina Oil Pollution and Hazardous Substances Control Act of 1978, N.C. Gen. Stat. § 143-215.75, *et seq*. ("OPHSCA"). At all times relevant hereto, CPC discharged or caused to be discharged one or more controlled oils or hazardous substances into or upon the waters and lands, or the sewer, surface water drain, or other

28

waters that drain into the waters of North Carolina, specifically, those waters and lands upon the Plaintiffs' properties located within the State of North Carolina.

140. At all times relevant hereto, CPC had control over the oil and hazardous substance materials within the meaning of OPHSCA and were responsible for using, transferring, storing, or transporting oils and hazardous substances immediately prior to a discharge of the substances under N.C. Gen. Stat. § 143-215.77(5).

141. Each of the hydrocarbon substances found in the samples taken by CPC which spilled herein is an "oil" and/or a "hazardous substance" within the meaning of OPHSCA; *see* N.C. Gen. Stat. § 143-215.77.

142. At all times relevant hereto, CPC discharged or caused to be discharged one or more oils or hazardous substances. Each such discharge was in violation of N.C. Gen. Stat. § 143-215.75, *et seq.*

143. At all times relevant hereto, CPC has failed to take reasonable actions to swiftly and expeditiously clean up the oils and hazardous chemicals and substances that were discharged including but not limited to onto the properties owned by one or more of the Plaintiffs.

144. The discharge of the hazardous substances was directly and proximately caused by the negligence of CPC herein, and has resulted in damage to Plaintiffs' properties.

145. The contamination and harm to the property remains inadequately remediated by CPC although it is five years after the April 2013 release of approximately five hundred (500) gallons of hydraulic fluid, which also exposed evidence of one or more historic releases reflecting contamination significantly beyond just the 500 gallons.

146. As a direct and proximate result of the aforesaid acts and omissions of CPC, Plaintiffs have sustained damages in an amount in excess of $25,000.

29

## SECOND CLAIM FOR RELIEF
### Negligence and Willful and Reckless Conduct
### (Defendants CPC and Apex)

147.    Plaintiffs incorporate herein by reference the allegations contained in preceding paragraphs as though same are fully set forth herein.

148.    During the pertinent times, Defendants had a duty to perform its activities on and around CPC's property and the Plaintiffs' properties with due care.

149.    Defendants violated their duty of due care by acting negligently, delinquently and inadequately in connection with the relevant work activities to control and maintain the pipeline, to prevent contamination, releases and spills, to make an adequate investment to prevent injurious incidents from happening in this residential neighborhood as they have happened in numerous past incidents at CPC sites, to warn and notify the Plaintiffs, and to remediate contamination directly caused by releases from the pipeline and other pollution to Plaintiffs' properties and surrounding areas.

150.    On information and belief, during the pertinent times, CPC did not take all necessary diligence with regard to the Booster Station to survey for potential problems and correct existing ones, and failed to meet one or more standards promulgated by its written Integrity Management Program, Maintenance Manual, Damage Prevention Program, or its Engineering Standards.

151.    CPC's pattern and practice rising to the level of gross negligence and reckless and willful conduct is evidenced by the historical incidents alleged above. CPC, though owned by some of the largest and most profitable petrochemical corporations in the world, failed to invest in appropriate measures despite being on notice of the danger as previously evidenced by incidents such as in 1996 when nearly one million gallons of diesel fuel was spilled into Reedy River, South

30

Carolina, polluting a 34-mile stretch of the river; in 1997, when 18,900 gallons of gasoline spilled in Bear Creek, Georgia; and in 1999, when 53,550 gallons of fuel oil polluted eight miles of the Tennessee River.

152.    Defendant Apex is jointly and severally liable given its involvement in the facts and circumstances herein and in light of its professed expertise in engineering, contamination and remediation matters.

153.    As a direct and proximate result of Defendants' aforementioned acts and omissions, Plaintiffs have been harmed and have sustained damages in an amount to be determined at trial in excess of $25,000.

## THIRD CLAIM FOR RELIEF
### Trespass
### (Defendant CPC)

154.    Plaintiffs incorporate herein by reference the allegations contained in preceding paragraphs as though same are fully set forth herein.

155.    At all times relevant hereto, Plaintiffs were the record owners of their property and were in actual possession of those properties at the time that CPC trespassed or actionably caused a trespass upon their lands.

156.    Upon information and belief, CPC made or contributed to the making of an intentional and unauthorized, and therefore unlawful, entry upon the land, including but not limited to, by way of the CPC's pipeline releasing and discharging in excess of five hundred (500) gallons of hydraulic fluid onto the Plaintiffs' properties.

157.    Plaintiffs were and continue to be damaged by CPC's invasion of their right of possession in their land. Most, if not all, Plaintiffs have lived, grown up, or still own properties which have been in their family for decades.

31

158.    As a direct and proximate result of CPC's acts and omissions, Plaintiffs have been harmed and have sustained substantial damages for trespass in an amount to be determined at trial in excess of $25,000.

## FOURTH CLAIM FOR RELIEF
### Private Recurrent Nuisance
### (Defendant CPC)

159.    Plaintiffs incorporate herein by reference the allegations contained in preceding paragraphs as though same are fully set forth herein.

160.    Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

161.    CPC, during the pertinent times, owned and materially controlled the Booster Station that is in close proximity to Plaintiffs' properties causing a private nuisance.

162.    CPC had a duty to control and assess the continued contamination plume that is in close proximity to the Plaintiffs' properties causing a private nuisance.

163.    Plaintiffs' right to use and enjoy their properties have been impaired by the acts and omissions of Defendant; the unannounced entry and intrusion onto their properties, and other sources of nuisance.

164.    The nuisance and evidence of historical releases have substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their properties, and have caused anger, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to continue to develop properties, and injury to and diminished value of properties through excessive contamination of their land.

32

165. Defendant has engaged in improper or negligent operation of the Booster Station during some or all of the pertinent times, causing harm to the Plaintiffs.

166. Defendant's conduct has been unreasonable. Reasonable persons, generally assessing Defendant's conduct, the interests of the community, the character of the neighborhood, the nature, utility, and social value of the use of the land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendants' conduct to be unreasonable.

167. As a direct and proximate result of the Defendant's creation and maintenance of an unlawful nuisance, Plaintiffs have been damaged in an amount to be determined at trial in excess of $25,000.

## FIFTH CLAIM FOR RELIEF
### Strict Liability – Ultrahazardous Activity
### (Defendant CPC)

168. Plaintiffs incorporate herein by reference the allegations contained in preceding paragraphs as though same fully set forth herein.

169. CPC engaged in abnormally dangerous activity by releasing hazardous hydrocarbon contaminants into the ground.

170. Because of these activities, CPC caused toxic and hazardous petroleum-related contaminants to be released into the surrounding community in violation of regulations and standards, including by the petroleum release dating from April 2013 and by releases evidenced by unreported historical releases at the same facility.

171. These abnormally dangerous activities necessarily involve serious risk of harm to the person, land or chattels of another, and cannot be eliminated by the exercise of due care, nor are they a matter of common usage.

33

172. CPC's activities were and are egregious and inappropriate in light of the nearby residential community, and any benefit to CPC by not investing in appropriate safeguards and corrective measures is outweighed by its dangerous history of unreported and non-remediated releases, here and elsewhere.

173. As a direct and proximate cause of CPC's abnormally dangerous activities, Plaintiffs have been exposed to significant levels of hazardous and toxic contaminants, and/or, have suffered or face the threat of suffering diminution in the values of their properties and have experienced lass of use and enjoyment of property and other economic loss. These harms are recurrent and ongoing.

174. Plaintiffs are entitled to compensatory damages in an amount to be determined by a jury in the trial of this action, in excess of $25,000.

## SIXTH CLAIM FOR RELIEF
### Punitive Damages
### (Defendant CPC)

175. Plaintiffs incorporate herein by reference the allegations contained in preceding paragraphs as though same are fully set forth herein.

176. CPC's above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

177. Pursuant to N.C. Gen. Stat. § 1D-15(a), CPC is properly liable for punitive damages in this action in that CPC is liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award for punitive damages, including without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

34

178. The recurring conduct, acts, omissions, negligence, and impropriety of CPC were willful, wanton, malicious, and in reckless disregard for the rights and interests of the Plaintiffs and justify an award of punitive damages. Accordingly, Plaintiffs demand judgment against CPC for punitive damages in an amount to be determined at trial.

179. During the pertinent times, Defendants had actual knowledge of the dangers to individuals similarly situated to all Plaintiffs surrounding the Booster Station located in Davidson County. CPC was on notice of the dangers due to a lengthy series of past incidents on its pipeline network, yet willfully failed to invest the necessary resources to end the recurrent events, which have now injured the Plaintiffs.

180. CPC deliberately, intentionally and purposefully continued to operate the pipeline that carried hazardous oil or other hazardous substances in violation of North Carolina statutes. CPC's willful and wanton and reckless conduct has been evidenced by acts upon information and belief including but not limited to:

(a) Failing to take appropriate steps to check for and prevent emissions at the Booster Station despite decades of numerous similar events along its pipeline;

(b) Failing to remediate and monitor pipeline releases including but not limited to at the aboveground one-inch central hydraulic line;

(b) Failing to provide property owners with proper notice of historic spills and significant contamination in the soil and groundwater;

(c) Failing to properly detect releases and to properly report all incidents to the NCDEQ;

(d) Callously and deliberately engaging in delayed, inadequate and woefully insufficient efforts to correct the harm to the Plaintiffs' homesteads;

(e) Callously and intentionally refusing to cooperate in taking steps to protect the Plaintiffs' and alleviate the harm such as timely and adequately providing notice of contamination and its affects it has on their properties; and

(f) Such other aggravating factors as will be proven at trial.

35

181.    The foregoing deliberate, intentional and purposeful acts of CPC constitutes willful and wanton disregard for the community water supply and a reckless indifference for the laws of North Carolina and are a direct and proximate cause of the damages suffered by Plaintiffs and thus, Plaintiffs are entitled to punitive damages.

182.    Pursuant to N.C. Gen. Stat. § 1D-1 *et seq*., CPC has engaged in one or more aggravating factors and are accordingly liable for punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### Declaratory and Injunctive Relief

183.    Plaintiffs incorporate herein by reference the allegations contained in preceding paragraphs as though same are fully set forth herein.

184.    In addition to and in the alternative to all other claims, the Plaintiffs also requests that the Court use its equitable and injunctive authority to enter injunctive relief in the favor of the Plaintiffs, including but not limited to issuance of an injunction requiring Colonial Pipeline to end any further contamination-producing activities, determine the exact release locations, repair and replace damaged pipeline to prevent further releases, and take forceful and affirmative steps to remedy the currently existing environmental contamination still affecting the Plaintiffs and endangering their families and the value of their chief asset, i.e. their private property.

## JURY DEMAND

Plaintiffs hereby respectfully requests a trial by jury of all issues and claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs pray for the Court to enter judgment against the Defendants jointly and severally and to award relief including:

36

1. That the Plaintiffs recover from Defendants monetary damages in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00) to be determined at trial;

2. That the Plaintiffs recover from Defendant Colonial Pipeline punitive damages in an amount to be determined at trial;

3. That the Plaintiffs receive declaratory and injunctive relief as deemed appropriate by the Court;

4. That the cost of this action be taxed against Defendants, including pre-judgment interest pursuant to N.C. Gen. Stat. § 24-5, post-judgment interest and any other costs, expenses or attorney's fees allowable by law;

5. For trial by jury as to all issues so triable; and

6. For such other and further relief as the Court may deem just and proper.

Dated: This the 25th day of May, 2018.

Respectfully submitted,

*Mona Wallace by Ed*

Mona Lisa Wallace
N.C. State Bar No. 9021
Kayleigh Lynn Messersmith
N.C. State Bar No. 51873
WALLACE AND GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
kmessersmith@wallacegraham.com
*Attorneys for Plaintiffs*

37



CERTIFIED MAIL®

9414 7266 9904 2103 5357 05

neopost
05/20/2018
US POSTAGE $08.67

FIRST-CLASS MAIL

ZIP 28144
041L11245995

WALLACE and GRAHAM, P.A.
ATTORNEYS AT LAW
525 NORTH MAIN STREET
SALISBURY, NORTH CAROLINA 28144

WALLACE and GRAHAM, P.A.
ATTORNEYS AT LAW
525 NORTH MAIN STREET
SALISBURY, NORTH CAROLINA 28144

TO:

Colonial Pipeline Company
c/o Corporation Service Company
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608

# STATE OF NORTH CAROLINA

_____Guilford_____ County

File No.

18 CVS 5537

In The General Court Of Justice
☐ District  ☒ Superior Court Division

Jackie Braswell, et al.

| Additional File Numbers |

## VERSUS

Colonial Pipeline Company and Apex Companies, LLC

## SUBPOENA

G.S. 1A-1, Rule 45; 8-59, -61, -63; 15A-801, -802

| Party Requesting Subpoena | NOTE TO PARTIES NOT REPRESENTED BY COUNSEL: *Subpoenas may be produced at your request, but must be signed and issued by the office of the Clerk of Superior Court, or by a magistrate or judge.* |
|---|---|
| ☒ State/Plaintiff  ☐ Defendant | |

**TO** | Name And Address Of Person Subpoenaed
Apex Companies, LLC
c/o Registered Agent Solutions, Inc.
176 Mine Lake Court, Suite 100
Raleigh                    NC   27615-6417 | Alternate Address |

| Telephone No. | Telephone No. |

## YOU ARE COMMANDED TO: *(check all that apply)*

☐ appear and testify, in the above entitled action, before the court at the place, date and time indicated below.

☐ appear and testify, in the above entitled action, at a deposition at the place, date and time indicated below.

☒ produce and permit inspection and copying of the following items, at the place, date and time indicated below.

    ☒ See attached list. *(List here if space sufficient)*

      See attached Exhibit A

| Name And Location Of Court/Place Of Deposition/Place To Produce
Kayleigh L. Messersmith
Wallace & Graham, P.A.
525 N. Main Street
Salisbury                    NC   28144 | Date To Appear/Produce, Until Released
6/29/2018 |
|---|---|
| | Time To Appear/Produce, Until Released
10:00   ☒ AM  ☐ PM |
| Name And Address Of Applicant Or Applicant's Attorney
Kayleigh L. Messersmith
Wallace & Graham, P.A.
525 N. Main Street
Salisbury                    NC   28144 | Date  06/15/2018 |
| | Signature  *Kayleigh L. M.* |
| Telephone No. Of Applicant Or Applicant's Attorney
704-633-5244 | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court
☐ Magistrate ☒ Attorney/DA ☐ District Court Judge
☐ Superior Court Judge |

## RETURN OF SERVICE

I certify this subpoena was received and served on the person subpoenaed as follows:

By ☐ personal delivery.    ☐ registered or certified mail, receipt requested and attached.

☐ telephone communication by Sheriff *(use only for a witness subpoenaed to appear and testify)*

☐ telephone communication by local law enforcement agency *(use only for a witness subpoenaed to appear and testify in a criminal case).*

**NOTE TO COURT:** *If the witness was served by telephone communication from a local law enforcement agency in a criminal case, the court may **not** issue a show cause order or order for arrest against the witness until the witness has been served personally with the written subpoena.*

☐ I was unable to serve this subpoena. Reason unable to serve: _____.

| Service Fee
$ | ☐ Paid
☐ Due | Date Served | Name Of Authorized Server (type or print) | Signature Of Authorized Server | Title/Agency |

**NOTE TO PERSON REQUESTING SUBPOENA:** *A copy of this subpoena must be delivered, mailed or faxed to the attorney for each party in this case. If a party is not represented by an attorney, the copy must be mailed or delivered to the party. This does not apply in criminal cases.*

AOC-G-100, Rev. 2/18
© 2018 Administrative Office of the Courts

*(Please see reverse side)*

**NOTE: Rule 45, North Carolina Rules of Civil Procedure, Subsections (c) and (d).**

**(c) Protection of Persons Subject to Subpoena**

(1) <u>Avoid undue burden or expense.</u> - A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena. The court shall enforce this subdivision and impose upon the party or attorney in violation of this requirement an appropriate sanction that may include compensating the person unduly burdened for lost earnings and for reasonable attorney's fees.

(2) <u>For production of public records or hospital medical records.</u> - Where the subpoena commands any custodian of public records or any custodian of hospital medical records, as defined in G.S. 8-44.1, to appear for the sole purpose of producing certain records in the custodian's custody, the custodian subpoenaed may, in lieu of personal appearance, tender to the court in which the action is pending by registered or certified mail or by personal delivery, on or before the time specified in the subpoena, certified copies of the records requested together with a copy of the subpoena and an affidavit by the custodian testifying that the copies are true and correct copies and that the records were made and kept in the regular course of business, or if no such records are in the custodian's custody, an affidavit to that effect. When the copies of records are personally delivered under this subdivision, a receipt shall be obtained from the person receiving the records. Any original or certified copy of records or an affidavit delivered according to the provisions of this subdivision, unless otherwise objectionable, shall be admissible in any action or proceeding without further certification or authentication. Copies of hospital medical records tendered under this subdivision shall not be open to inspection or copied by any person, except to the parties to the case or proceedings and their attorneys in depositions, until ordered published by the judge at the time of the hearing or trial. Nothing contained herein shall be construed to waive the physician-patient privilege or to require any privileged communication under law to be disclosed.

(3) <u>Written objection to subpoenas.</u> - Subject to subsection (d) of this rule, a person commanded to appear at a deposition or to produce and permit the inspection and copying of records, books, papers, documents, electronically stored information, or tangible things may, within 10 days after service of the subpoena or before the time specified for compliance if the time is less than 10 days after service, serve upon the party or the attorney designated in the subpoena written objection to the subpoena, setting forth the specific grounds for the objection. The written objection shall comply with the requirements of Rule 11. Each of the following grounds may be sufficient for objecting to a subpoena:
   a. The subpoena fails to allow reasonable time for compliance.
   b. The subpoena requires disclosure of privileged or other protected matter and no exception or waiver applies to the privilege or protection.
   c. The subpoena subjects a person to an undue burden or expense.
   d. The subpoena is otherwise unreasonable or oppressive.
   e. The subpoena is procedurally defective.

(4) <u>Order of court required to override objection.</u> - If objection is made under subdivision (3) of this subsection, the party serving the subpoena shall not be entitled to compel the subpoenaed person's appearance at a deposition or to inspect and copy materials to which an objection has been made except pursuant to an order of the court. If objection is made, the party serving the subpoena may, upon notice to the subpoenaed person, move at any time for an order to compel the subpoenaed person's appearance at the deposition or the production of the materials designated in the subpoena. The motion shall be filed in the court in the county in which the deposition or production of materials is to occur.

(5) <u>Motion to quash or modify subpoena.</u> - A person commanded to appear at a trial, hearing, deposition, or to produce and permit the inspection and copying of records, books, papers, documents, electronically stored information, or other tangible things, within 10 days after service of the subpoena or before the time specified for compliance if the time is less than 10 days after service, may file a motion to quash or modify the subpoena. The court shall quash or modify the subpoena if the subpoenaed person demonstrates the existence of any of the reasons set forth in subdivision (3) of this subsection. The motion shall be filed in the court in the county in which the trial, hearing, deposition, or production of materials is to occur.

(6) <u>Order to compel; expenses to comply with subpoena.</u> - When a court enters an order compelling a deposition or the production of records, books, papers, documents, electronically stored information, or other tangible things, the order shall protect any person who is not a party or an agent of a party from significant expense resulting from complying with the subpoena. The court may order that the person to whom the subpoena is addressed will be reasonably compensated for the cost of producing the records, books, papers, documents, electronically stored information, or tangible things specified in the subpoena.

(7) <u>Trade secrets; confidential information.</u> - When a subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information, a court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or when the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot otherwise be met without undue hardship, the court may order a person to make an appearance or produce the materials only on specified conditions stated in the order.

(8) <u>Order to quash; expenses.</u> - When a court enters an order quashing or modifying the subpoena, the court may order the party on whose behalf the subpoena is issued to pay all or part of the subpoenaed person's reasonable expenses including attorney's fees.

**(d) Duties in Responding to Subpoena**

(1) <u>Form of response.</u> - A person responding to a subpoena to produce records, books, documents, electronically stored information, or tangible things shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

(2) <u>Form of producing electronically stored information not specified.</u> - If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it ordinarily is maintained or in a reasonably useable form or forms.

(3) <u>Electronically stored information in only one form.</u> - The person responding need not produce the same electronically stored information in more than one form.

(4) <u>Inaccessible electronically stored information.</u> - The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, after considering the limitations of Rule 26(b)(1a). The court may specify conditions for discovery, including requiring the party that seeks discovery from a nonparty to bear the costs of locating, preserving, collecting, and producing the electronically stored information involved.

(5) <u>Specificity of objection.</u> - When information subject to a subpoena is withheld on the objection that it is subject to protection as trial preparation materials, or that it is otherwise privileged, the objection shall be made with specificity and shall be supported by a description of the nature of the communications, records, books, papers, documents, electronically stored information, or other tangible things not produced, sufficient for the requesting party to contest the objection.

---

## INFORMATION FOR WITNESS

**NOTE:** *If you have any questions about being subpoenaed as a witness, you should contact the person named on Page One of this Subpoena in the box labeled "Name And Address Of Applicant Or Applicant's Attorney."*

**DUTIES OF A WITNESS**
- Unless otherwise directed by the presiding judge, you must answer all questions asked when you are on the stand giving testimony.
- In answering questions, speak clearly and loudly enough to be heard.
- Your answers to questions must be truthful.
- If you are commanded to produce any items, you must bring them with you to court or to the deposition.
- You must continue to attend court until released by the court. You must continue to attend a deposition until the deposition is completed.

**BRIBING OR THREATENING A WITNESS**
It is a violation of State law for anyone to attempt to bribe, threaten, harass, or intimidate a witness. If anyone attempts to do any of these things concerning your involvement as a witness in a case, you should promptly report that to the district attorney or the presiding judge.

**WITNESS FEE**
A witness under subpoena and that appears in court to testify, is entitled to a small daily fee, and to travel expense reimbursement, if it is necessary to travel outside the county in order to testify. (The fee for an "expert witness" will be set by the presiding judge.) After you have been discharged as a witness, if you desire to collect the statutory fee, you should immediately contact the Clerk's office and certify your attendance as a witness so that you will be paid any amount due you.

EXHIBIT A

Pursuant to the subpoena *duces tecum* to which this "EXHIBIT A" is attached, Apex Companies, LLC is hereby commanded to produce copies of the following or the following originals for copying and inspection:

1. Your complete project file related to the Lexington Booster Station Property, located at 667 Helmstetler Road in Lexington, North Carolina, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the surrounding residential properties; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

2. Your complete file on all testing, investigation, sampling, and property assessments regarding any and all releases at or surrounding the Lexington Booster Station, including but not limited to any and all documents and/or tangible evidence in your possession regarding any and all releases since 1980.

3. Your complete file, notes, testing, documents, and records of any kind relating to any and all releases at or within five (5) miles of the Lexington Booster Station at any time since its inception.

4. Your complete project file related to the Jackie and Judy Braswell Property, located at 517 Helmstetler Road, Lexington, North Carolina 27295, which is adjacent to the Lexington Booster Station Property described above, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jackie and Judy Braswell Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

5. Your complete project file related to the Bonnie and Harold Collins Property, located at 401 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Bonnie and Harold Collins Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

6. Your complete project file related to the Penny and Haymon Hicks Property, located at 206 Yarborough Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Penny and Haymon Hicks Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling

information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

7. Your complete project file related to the James and Pamela Loveless, located at 286 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the James and Pamela Loveless Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

8. Your complete project file related to the Jeffrey and Kathy Miller Property, located at 398 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jeffrey and Kathy Miller Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

9. Your complete project file related to the Gina Myers Shaw Property, which is across the street from the Lexington Booster Station described above, and is recorded with the Davidson County Register of Deeds at Book 02023, Page 1697, in Lexington, North Carolina, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Gina Myers Shaw Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

10. Your complete project file related to the James and Debbie Slone Property, located at 247 Yarborough Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the James and Debbie Slone Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

11. Your complete project file related to the Joey and Shaina Smith Property, located at 676 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Joey and Shaina Smith Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

12. Your complete project file related to the Jerry and Karen Smith Property, located at 321 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jerry and Karen Smith Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

13. Your complete project file related to the 551 Helmstetler Road Property, located at 551 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the 551 Helmstetler Road Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

14. A complete copy of any and all bids, estimates, scopes of work, subcontracting agreements, consulting agreements, or service agreements, whether in draft or final form, detailing any aspect of your work.

15. A complete copy of any and all reports, including any and all revisions, changes, additions, and edits thereto, relating in any way to the properties identified in numbered paragraphs 2 through 11 above.

16. A copy of all correspondence between you and any employee of Apex Companies, LLC regarding the properties identified in numbered paragraphs 1 through 11 above.

17. A copy of all correspondence between you and any attorney, staff member, employee or agent of NC DEQ regarding the properties identified in numbered paragraphs 1 through 11 above.

18. A copy of all correspondence between you and any attorney, staff member, employee or agent of any insurance company, agent or adjuster regarding the properties identified in numbered paragraphs 1 through 11 above.

19. A copy of all correspondence between you and any attorney, staff member, employee or agent of any and all laboratories regarding the properties identified in numbered paragraphs 1 through 11 above.

20. A copy of all correspondence between you and any attorney, staff member, employee or agent of any and all State of North Carolina governmental, regulator, or administrative entity regarding the properties identified in numbered paragraphs 1 through 11 above.

21. A complete copy of your fee structure in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

22. A complete copy of all invoices you have submitted for payment in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

23. A complete copy of all proof of payment made in satisfaction of the invoices identified in No. 17 in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

24. A complete copy of all reports, information, records related to releases that have occurred at the Lexington Booster Station Property described above, including but not limited to above and below ground releases, reported and known but unreported releases, and releases on or along the property, and all releases related to the properties identified in numbered paragraphs 2 through 11 above.

If, rather than producing the documents physically, you would prefer to electronically transfer the files, you may send them via a secure document link or via electronic mail to kmessersmith@wallacegraham.com, or via an electronic storage medium such as a flash drive or thumb drive.

# STATE OF NORTH CAROLINA

_____Guilford_____ County

**File No.** 18 CVS 5537

In The General Court Of Justice
☐ District ☒ Superior Court Division

Jackie Braswell, et al.

**VERSUS**

Colonial Pipeline Company and Apex Companies, LLC

**Additional File Numbers**

# SUBPOENA

G.S. 1A-1, Rule 45; 8-59, -61, -63; 15A-801, -802

| *Party Requesting Subpoena* | **NOTE TO PARTIES NOT REPRESENTED BY COUNSEL:** *Subpoenas may be produced at your request, but must be signed and issued by the office of the Clerk of Superior Court, or by a magistrate or judge.* |
|---|---|
| ☒ State/Plaintiff ☐ Defendant | |

**TO** *Name And Address Of Person Subpoenaed*
Colonial Pipeline Company
c/o Corporation Service Company
2626 Glenwood Avenue, Suite 550
Raleigh          NC     27608

*Telephone No.*

*Alternate Address*

*Telephone No.*

**YOU ARE COMMANDED TO:** *(check all that apply)*

☐ appear and testify, in the above entitled action, before the court at the place, date and time indicated below.

☐ appear and testify, in the above entitled action, at a deposition at the place, date and time indicated below.

☒ produce and permit inspection and copying of the following items, at the place, date and time indicated below.

   ☒ See attached list. *(List here if space sufficient)*

     See attached Exhibit A

*Name And Location Of Court/Place Of Deposition/Place To Produce*
Kayleigh L. Messersmith
Wallace & Graham, P.A.
525 N. Main Street
Salisbury          NC     28144

*Name And Address Of Applicant Or Applicant's Attorney*
Kayliegh L. Messersmith
Wallace & Graham, P.A.
525 N. Main Street
Salisbury          NC     28144

*Telephone No. Of Applicant Or Applicant's Attorney*
704-633-5244

*Date To Appear/Produce, Until Released*
6/29/2018

*Time To Appear/Produce, Until Released*
10:00          ☒ AM   ☐ PM

*Date* 06/15/2018

*Signature* Kayleigh L. M...

☐ Deputy CSC     ☐ Assistant CSC     ☐ Clerk Of Superior Court
☐ Magistrate     ☒ Attorney/DA       ☐ District Court Judge
                                      ☐ Superior Court Judge

## RETURN OF SERVICE

I certify this subpoena was received and served on the person subpoenaed as follows:

By ☐ personal delivery.          ☐ registered or certified mail, receipt requested and attached.

☐ telephone communication by Sheriff *(use only for a witness subpoenaed to appear and testify).*

☐ telephone communication by local law enforcement agency *(use only for a witness subpoenaed to appear and testify in a criminal case).*

   **NOTE TO COURT:** *If the witness was served by telephone communication from a local law enforcement agency in a criminal case, the court may **not** issue a show cause order or order for arrest against the witness until the witness has been served personally with the written subpoena.*

☐ I was unable to serve this subpoena. Reason unable to serve: _____

| *Service Fee* | ☐ Paid ☐ Due | *Date Served* | *Name Of Authorized Server (type or print)* | *Signature Of Authorized Server* | *Title/Agency* |
|---|---|---|---|---|---|
| $ | | | | | |

**NOTE TO PERSON REQUESTING SUBPOENA:** *A copy of this subpoena must be delivered, mailed or faxed to the attorney for each party in this case. If a party is not represented by an attorney, the copy must be mailed or delivered to the party. This does not apply in criminal cases.*

AOC-G-100, Rev. 2/18
© 2018 Administrative Office of the Courts

*(Please see reverse side)*

**(c) Protection of Persons Subject to Subpoena**

(1) Avoid undue burden or expense. - A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena. The court shall enforce this subdivision and impose upon the party or attorney in violation of this requirement an appropriate sanction that may include compensating the person unduly burdened for lost earnings and for reasonable attorney's fees.

(2) For production of public records or hospital medical records. - Where the subpoena commands any custodian of public records or any custodian of hospital medical records, as defined in G.S. 8-44.1, to appear for the sole purpose of producing certain records in the custodian's custody, the custodian subpoenaed may, in lieu of personal appearance, tender to the court in which the action is pending by registered or certified mail or by personal delivery, on or before the time specified in the subpoena, certified copies of the records requested together with a copy of the subpoena and an affidavit by the custodian testifying that the copies are true and correct copies and that the records were made and kept in the regular course of business, or if no such records are in the custodian's custody, an affidavit to that effect. When the copies of records are personally delivered under this subdivision, a receipt shall be obtained from the person receiving the records. Any original or certified copy of records or an affidavit delivered according to the provisions of this subdivision, unless otherwise objectionable, shall be admissible in any action or proceeding without further certification or authentication. Copies of hospital medical records tendered under this subdivision shall not be open to inspection or copied by any person, except to the parties to the case or proceedings and their attorneys in depositions, until ordered published by the judge at the time of the hearing or trial. Nothing contained herein shall be construed to waive the physician-patient privilege or to require any privileged communication under law to be disclosed.

(3) Written objection to subpoenas. - Subject to subsection (d) of this rule, a person commanded to appear at a deposition or to produce and permit the inspection and copying of records, books, papers, documents, electronically stored information, or tangible things may, within 10 days after service of the subpoena or before the time specified for compliance if the time is less than 10 days after service, serve upon the party or the attorney designated in the subpoena written objection to the subpoena, setting forth the specific grounds for the objection. The written objection shall comply with the requirements of Rule 11. Each of the following grounds may be sufficient for objecting to a subpoena:
    a. The subpoena fails to allow reasonable time for compliance.
    b. The subpoena requires disclosure of privileged or other protected matter and no exception or waiver applies to the privilege or protection.
    c. The subpoena subjects a person to an undue burden or expense.
    d. The subpoena is otherwise unreasonable or oppressive.
    e. The subpoena is procedurally defective.

(4) Order of court required to override objection. - If objection is made under subdivision (3) of this subsection, the party serving the subpoena shall not be entitled to compel the subpoenaed person's appearance at a deposition or to inspect and copy materials to which an objection has been made except pursuant to an order of the court. If objection is made, the party serving the subpoena may, upon notice to the subpoenaed person, move at any time for an order to compel the subpoenaed person's appearance at the deposition or the production of the materials designated in the subpoena. The motion shall be filed in the court in the county in which the deposition or production of materials is to occur.

(5) Motion to quash or modify subpoena. - A person commanded to appear at a trial, hearing, deposition, or to produce and permit the inspection and copying of records, books, papers, documents, electronically stored information, or other tangible things, within 10 days after service of the subpoena or before the time specified for compliance if the time is less than 10 days after service, may file a motion to quash or modify the subpoena. The court shall quash or modify the subpoena if the subpoenaed person demonstrates the existence of any of the reasons set forth in subdivision (3) of this subsection. The motion shall be filed in the court in the county in which the trial, hearing, deposition, or production of materials is to occur.

(6) Order to compel; expenses to comply with subpoena. - When a court enters an order compelling a deposition or the production of records, books, papers, documents, electronically stored information, or other tangible things, the order shall protect any person who is not a party or an agent of a party from significant expense resulting from complying with the subpoena. The court may order that the person to whom the subpoena is addressed will be reasonably compensated for the cost of producing the records, books, papers, documents, electronically stored information, or tangible things specified in the subpoena.

(7) Trade secrets; confidential information. - When a subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information, a court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or when the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot otherwise be met without undue hardship, the court may order a person to make an appearance or produce the materials only on specified conditions stated in the order.

(8) Order to quash; expenses. - When a court enters an order quashing or modifying the subpoena, the court may order the party on whose behalf the subpoena is issued to pay all or part of the subpoenaed person's reasonable expenses including attorney's fees.

**(d) Duties in Responding to Subpoena**

(1) Form of response. - A person responding to a subpoena to produce records, books, documents, electronically stored information, or tangible things shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

(2) Form of producing electronically stored information not specified. - If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it ordinarily is maintained or in a reasonably useable form or forms.

(3) Electronically stored information in only one form. - The person responding need not produce the same electronically stored information in more than one form.

(4) Inaccessible electronically stored information. - The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, after considering the limitations of Rule 26(b)(1a).The court may specify conditions for discovery, including requiring the party that seeks discovery from a nonparty to bear the costs of locating, preserving, collecting, and producing the electronically stored information involved.

(5) Specificity of objection. - When information subject to a subpoena is withheld on the objection that it is subject to protection as trial preparation materials, or that it is otherwise privileged, the objection shall be made with specificity and be supported by a description of the nature of the communications, records, books, papers, documents, electronically stored information, or other tangible things not produced, sufficient for the requesting party to contest the objection.

## INFORMATION FOR WITNESS

**NOTE:** *If you have any questions about being subpoenaed as a witness, you should contact the person named on Page One of this Subpoena in the box labeled "Name And Address Of Applicant Or Applicant's Attorney."*

**DUTIES OF A WITNESS**
- Unless otherwise directed by the presiding judge, you must answer all questions asked when you are on the stand giving testimony.
- In answering questions, speak clearly and loudly enough to be heard.
- Your answers to questions must be truthful.
- If you are commanded to produce any items, you must bring them with you to court or to the deposition.
- You must continue to attend court until released by the court. You must continue to attend a deposition until the deposition is completed.

**BRIBING OR THREATENING A WITNESS**
It is a violation of State law for anyone to attempt to bribe, threaten, harass, or intimidate a witness. If anyone attempts to do any of these things concerning your involvement as a witness in a case, you should promptly report that to the district attorney or the presiding judge.

**WITNESS FEE**
A witness under subpoena and that appears in court to testify, is entitled to a small daily fee, and to travel expense reimbursement, if it is necessary to travel outside the county in order to testify. (The fee for an "expert witness" will be set by the presiding judge.) After you have been discharged as a witness, if you desire to collect the statutory fee, you should immediately contact the Clerk's office and certify your attendance as a witness so that you will be paid any amount due you.

EXHIBIT A

Pursuant to the subpoena *duces tecum* to which this "EXHIBIT A" is attached, Colonial Pipeline Company is hereby commanded to produce copies of the following or the following originals for copying and inspection:

1.  Your complete project file related to the Lexington Booster Station Property, located at 667 Helmstetler Road in Lexington, North Carolina: any and all documents and/or tangible evidence in your possession relating to the surrounding residential properties; including but not limited to correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

2.  Your complete file on all testing, investigation, sampling, and property assessments regarding any and all releases at or surrounding the Lexington Booster Station, including but not limited to any and all documents and/or tangible evidence in your possession regarding any and all releases since 1980.

3.  Your complete file, notes, testing, documents, and records of any kind relating to any and all releases at or within five (5) miles of the Lexington Booster Station at any time since its inception.

4.  All files, notes, testing, documents, and records of any kind relating to any and all releases at within 5 miles of the Lexington Booster Station at any time since its inception.

5.  Your complete project file related to the Jackie and Judy Braswell Property, located at 517 Helmstetler Road, Lexington, North Carolina 27295, which is adjacent to the Lexington Booster Station Property described above, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jackie and Judy Braswell Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

6.  Your complete project file related to the Bonnie and Harold Collins Property, located at 401 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Bonnie and Harold Collins Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

7. Your complete project file related to the Penny and Haymon Hicks Property, located at 206 Yarborough Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Penny and Haymon Hicks Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

8. Your complete project file related to the James and Pamela Loveless, located at 286 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the James and Pamela Loveless Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

9. Your complete project file related to the Jeffrey and Kathy Miller Property, located at 398 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jeffrey and Kathy Miller Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

10. Your complete project file related to the Gina Myers Shaw Property, which is across the street from the Lexington Booster Station described above, and is recorded with the Davidson County Register of Deeds at Book 02023, Page 1697, in Lexington, North Carolina, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Gina Myers Shaw Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

11. Your complete project file related to the James and Debbie Slone Property, located at 247 Yarborough Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the James and Debbie Slone Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

12. Your complete project file related to the Joey and Shaina Smith Property, located at 676 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Joey and Shaina Smith Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

13. Your complete project file related to the Jerry and Karen Smith Property, located at 321 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jerry and Karen Smith Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

14. Your complete project file related to the 551 Helmstetler Road Property, located at 551 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the 551 Helmstetler Road Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

15. A complete copy of any and all bids, estimates, scopes of work, subcontracting agreements, consulting agreements, or service agreements, whether in draft or final form, detailing any aspect of your work.

16. A complete copy of any and all reports, including any and all revisions, changes, additions, and edits thereto, relating in any way to the properties identified in numbered paragraphs 2 through 11 above.

17. A copy of all correspondence between you and any employee of Apex Companies, LLC regarding the properties identified in numbered paragraphs 1 through 11 above.

18. A copy of all correspondence between you and any attorney, staff member, employee or agent of NC DEQ regarding the properties identified in numbered paragraphs 1 through 11 above.

19. A copy of all correspondence between you and any attorney, staff member, employee or agent of any insurance company, agent or adjuster regarding the properties identified in numbered paragraphs 1 through 11 above.

20. A copy of all correspondence between you and any attorney, staff member, employee or agent of any and all laboratories regarding the properties identified in numbered paragraphs 1 through 11 above.

21. A copy of all correspondence between you and any attorney, staff member, employee or agent of any and all State of North Carolina governmental, regulator, or administrative entity regarding the properties identified in numbered paragraphs 1 through 11 above.

22. A complete copy of your fee structure in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

23. A complete copy of all invoices you have submitted for payment in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

24. A complete copy of all proof of payment made in satisfaction of the invoices identified in No. 17 in relation to any and all work performed in connection with  the properties identified in numbered paragraphs 1 through 11 above.

25. A complete copy of all reports, information, records related to releases that have occurred at the Lexington Booster Station Property described above, including but not limited to above and below ground releases, reported and known but unreported releases, and releases on or along the property, and all releases related to the properties identified in numbered paragraphs 2 through 11 above.

If, rather than producing the documents physically, you would prefer to electronically transfer the files, you may send them via a secure document link or via electronic mail to kmessersmith@wallacegraham.com, or via an electronic storage medium such as a flash drive or thumb drive.

# STATE OF NORTH CAROLINA

File No.
18 CVS 5537

_____ Guilford _____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

Jackie Braswell, et al.

Additional File Numbers

### VERSUS

Colonial Pipeline Company and Apex Companies, LLC

## SUBPOENA

G.S. 1A-1, Rule 45; 8-59, -61, -63; 15A-801, -802

| Party Requesting Subpoena | |
|---|---|
| ☒ State/Plaintiff | ☐ Defendant |

NOTE TO PARTIES NOT REPRESENTED BY COUNSEL: Subpoenas may be produced at your request, but must be signed and issued by the office of the Clerk of Superior Court, or by a magistrate or judge.

**TO** | Name And Address Of Person Subpoenaed
North Carolina Department of Environmental Quality

450 West Hanes Mill Road, Suite 300

Winston-Salem          NC        27105

Alternate Address

| Telephone No. | Telephone No. |
|---|---|
| 336-776-9800 | |

**YOU ARE COMMANDED TO:** *(check all that apply)*

☐ appear and testify, in the above entitled action, before the court at the place, date and time indicated below.

☐ appear and testify, in the above entitled action, at a deposition at the place, date and time indicated below.

☒ produce and permit inspection and copying of the following items, at the place, date and time indicated below.

  ☒ See attached list. *(List here if space sufficient)*

  See attached Exhibit A

| Name And Location Of Court/Place Of Deposition/Place To Produce | Date To Appear/Produce, Until Released |
|---|---|
| Kayleigh L. Messersmith | 6/29/2018 |

Wallace & Graham, P.A.

525 N. Main Street

| | Time To Appear/Produce, Until Released |
|---|---|
| Salisbury          NC        28144 | 10:00    ☒ AM  ☐ PM |

| Name And Address Of Applicant Or Applicant's Attorney | Date |
|---|---|
| Kayleigh L. Messersmith | 06/15/2018 |

Wallace & Graham, P.A.

525 N. Main Street

Signature

*Kayleigh L. M.*

| Salisbury          NC        28144 | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court |
|---|---|
| Telephone No. Of Applicant Or Applicant's Attorney | ☐ Magistrate  ☒ Attorney/DA  ☐ District Court Judge |
| 704-633-5244 | ☐ Superior Court Judge |

## RETURN OF SERVICE

I certify this subpoena was received and served on the person subpoenaed as follows:

By ☐ personal delivery.          ☐ registered or certified mail, receipt requested and attached.

☐ telephone communication by Sheriff *(use only for a witness subpoenaed to appear and testify)*.

☐ telephone communication by local law enforcement agency *(use only for a witness subpoenaed to appear and testify in a criminal case)*.

**NOTE TO COURT:** *If the witness was served by telephone communication from a local law enforcement agency in a criminal case, the court may **not** issue a show cause order or order for arrest against the witness until the witness has been served personally with the written subpoena.*

☐ I was unable to serve this subpoena. Reason unable to serve: _____

| Service Fee | | Date Served | Name Of Authorized Server (type or print) | Signature Of Authorized Server | Title/Agency |
|---|---|---|---|---|---|
| $ | ☐ Paid ☐ Due | | | | |

**NOTE TO PERSON REQUESTING SUBPOENA:** *A copy of this subpoena must be delivered, mailed or faxed to the attorney for each party in this case. If a party is not represented by an attorney, the copy must be mailed or delivered to the party. This does not apply in criminal cases.*

AOC-G-100, Rev. 2/18
© 2018 Administrative Office of the Courts

*(Please see reverse side)*

**NOTE: Rule 45, North Carolina Rules of Civil Procedure, Subsections (c) and (d).**

**(c) Protection of Persons Subject to Subpoena**

(1) <u>Avoid undue burden or expense.</u> - A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena. The court shall enforce this subdivision and impose upon the party or attorney in violation of this requirement an appropriate sanction that may include compensating the person unduly burdened for lost earnings and for reasonable attorney's fees.

(2) <u>For production of public records or hospital medical records.</u> - Where the subpoena commands any custodian of public records or any custodian of hospital medical records, as defined in G.S. 8-44.1, to appear for the sole purpose of producing certain records in the custodian's custody, the custodian subpoenaed may, in lieu of personal appearance, tender to the court in which the action is pending by registered or certified mail or by personal delivery, on or before the time specified in the subpoena, certified copies of the records requested together with a copy of the subpoena and an affidavit by the custodian testifying that the copies are true and correct copies and that the records were made and kept in the regular course of business, or if no such records are in the custodian's custody, an affidavit to that effect. When the copies of records are personally delivered under this subdivision, a receipt shall be obtained from the person receiving the records. Any original or certified copy of records or an affidavit delivered according to the provisions of this subdivision, unless otherwise objectionable, shall be admissible in any action or proceeding without further certification or authentication. Copies of hospital medical records tendered under this subdivision shall not be open to inspection or copied by any person, except to the parties to the case or proceeding and their attorneys in depositions, until ordered published by the judge at the time of the hearing or trial. Nothing contained herein shall be construed to waive the physician-patient privilege or to require any privileged communication under law to be disclosed.

(3) <u>Written objection to subpoenas.</u> - Subject to subsection (d) of this rule, a person commanded to appear at a deposition or to produce and permit the inspection and copying of records, books, papers, documents, electronically stored information, or tangible things may, within 10 days after service of the subpoena or before the time specified for compliance if the time is less than 10 days after service, serve upon the party or the attorney designated in the subpoena written objection to the subpoena, setting forth the specific grounds for the objection. The written objection shall comply with the requirements of Rule 11. Each of the following grounds may be sufficient for objecting to a subpoena:
    a. The subpoena fails to allow reasonable time for compliance.
    b. The subpoena requires disclosure of privileged or other protected matter and no exception or waiver applies to the privilege or protection.
    c. The subpoena subjects a person to an undue burden or expense.
    d. The subpoena is otherwise unreasonable or oppressive.
    e. The subpoena is procedurally defective.

(4) <u>Order of court required to override objection.</u> - If objection is made under subdivision (3) of this subsection, the party serving the subpoena shall not be entitled to compel the subpoenaed person's appearance at a deposition or to inspect and copy materials to which an objection has been made except pursuant to an order of the court. If objection is made, the party serving the subpoena may, upon notice to the subpoenaed person, move at any time for an order to compel the subpoenaed person's appearance at the deposition or the production of the materials designated in the subpoena. The motion shall be filed in the court in the county in which the deposition or production of materials is to occur.

(5) <u>Motion to quash or modify subpoena.</u> - A person commanded to appear at a trial, hearing, deposition, or to produce and permit the inspection and copying of records, books, papers, documents, electronically stored information, or other tangible things, within 10 days after service of the subpoena or before the time specified for compliance if the time is less than 10 days after service, may file a motion to quash or modify the subpoena. The court shall quash or modify the subpoena if the subpoenaed person demonstrates the existence of any of the reasons set forth in subdivision (3) of this subsection. The motion shall be filed in the court in the county in which the trial, hearing, deposition, or production of materials is to occur.

(6) <u>Order to compel; expenses to comply with subpoena.</u> - When a court enters an order compelling a deposition or the production of records, books, papers, documents, electronically stored information, or other tangible things, the order shall protect any person who is not a party or an agent of a party from significant expense resulting from complying with the subpoena. The court may order that the person to whom the subpoena is addressed will be reasonably compensated for the cost of producing the records, books, papers, documents, electronically stored information, or tangible things specified in the subpoena.

(7) <u>Trade secrets; confidential information.</u> - When a subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information, a court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or when the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot otherwise be met without undue hardship, the court may order a person to make an appearance or produce the materials only on specified conditions stated in the order.

(8) <u>Order to quash; expenses.</u> - When a court enters an order quashing or modifying the subpoena, the court may order the party on whose behalf the subpoena is issued to pay all or part of the subpoenaed person's reasonable expenses including attorney's fees.

**(d) Duties in Responding to Subpoena**

(1) <u>Form of response.</u> - A person responding to a subpoena to produce records, books, documents, electronically stored information, or tangible things shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

(2) <u>Form of producing electronically stored information not specified.</u> - If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it ordinarily is maintained or in a reasonably useable form or forms.

(3) <u>Electronically stored information in only one form.</u> - The person responding need not produce the same electronically stored information in more than one form.

(4) <u>Inaccessible electronically stored information.</u> - The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, after considering the limitations of Rule 26(b)(1a).The court may specify conditions for discovery, including requiring the party that seeks discovery from a nonparty to bear the costs of locating, preserving, collecting, and producing the electronically stored information involved.

(5) <u>Specificity of objection.</u> - When information subject to a subpoena is withheld on the objection that it is subject to protection as trial preparation materials, or that it is otherwise privileged, the objection shall be made with specificity and shall be supported by a description of the nature of the communications, records, books, papers, documents, electronically stored information, or other tangible things not produced, sufficient for the requesting party to contest the objection.

---

## INFORMATION FOR WITNESS

**NOTE:** *If you have any questions about being subpoenaed as a witness, you should contact the person named on Page One of this Subpoena in the box labeled "Name And Address Of Applicant Or Applicant's Attorney."*

**DUTIES OF A WITNESS**
- Unless otherwise directed by the presiding judge, you must answer all questions asked when you are on the stand giving testimony.
- In answering questions, speak clearly and loudly enough to be heard.
- Your answers to questions must be truthful.
- If you are commanded to produce any items, you must bring them with you to court or to the deposition.
- You must continue to attend court until released by the court. You must continue to attend a deposition until the deposition is completed.

**BRIBING OR THREATENING A WITNESS**
It is a violation of State law for anyone to attempt to bribe, threaten, harass, or intimidate a witness. If anyone attempts to do any of these things concerning your involvement as a witness in a case, you should promptly report that to the district attorney or the presiding judge.

**WITNESS FEE**
A witness under subpoena and that appears in court to testify, is entitled to a small daily fee, and to travel expense reimbursement, if it is necessary to travel outside the county in order to testify. (The fee for an "expert witness" will be set by the presiding judge.) After you have been discharged as a witness, if you desire to collect the statutory fee, you should immediately contact the Clerk's office and certify your attendance as a witness so that you will be paid any amount due you.

Pursuant to the subpoena *duces tecum* to which this "EXHIBIT A" is attached, North Carolina Department of Environmental Quality is hereby commanded to produce copies of the following or the following originals for copying and inspection:

1. Your complete project file related to the Lexington Booster Station Property, located at 667 Helmstetler Road in Lexington, North Carolina, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the surrounding residential properties; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

2. Your complete project file related to the Jackie and Judy Braswell Property, located at 517 Helmstetler Road, Lexington, North Carolina 27295, which is adjacent to the Lexington Booster Station Property described above, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jackie and Judy Braswell Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

3. Your complete project file related to the Bonnie and Harold Collins Property, located at 401 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Bonnie and Harold Collins Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

4. Your complete project file related to the Penny and Haymon Hicks Property, located at 206 Yarborough Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Penny and Haymon Hicks Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

5. Your complete project file related to the James and Pamela Loveless, located at 286 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the James and Pamela Loveless Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results;

sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

6. Your complete project file related to the Jeffrey and Kathy Miller Property, located at 398 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jeffrey and Kathy Miller Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

7. Your complete project file related to the Gina Myers Shaw Property, which is across the street from the Lexington Booster Station described above, and is recorded with the Davidson County Register of Deeds at Book 02023, Page 1697, in Lexington, North Carolina, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Gina Myers Shaw Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

8. Your complete project file related to the James and Debbie Slone Property, located at 247 Yarborough Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the James and Debbie Slone Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

9. Your complete project file related to the Joey and Shaina Smith Property, located at 676 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Joey and Shaina Smith Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

10. Your complete project file related to the Jerry and Karen Smith Property, located at 321 Matthew Drive, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the Jerry and Karen Smith Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

11. Your complete project file related to the 551 Helmstetler Road Property, located at 551 Helmstetler Road, Lexington, North Carolina 27295, including but not limited to: any and all documents and/or tangible evidence in your possession relating to your work and investigation of the 551 Helmstetler Road Property; correspondence; telephone calls; field notes (handwritten or typed); emails; ledgers; photographs in their native format; sampling information; test results; sketches; drawings; data; recordings; inspection reports; quotes; bids; back-up documentation; standards; articles; code material relied upon; and time and billing records.

12. A complete copy of any and all bids, estimates, scopes of work, subcontracting agreements, consulting agreements, or service agreements, whether in draft or final form, detailing any aspect of your work.

13. A complete copy of any and all reports, including any and all revisions, changes, additions, and edits thereto, relating in any way to the properties identified in numbered paragraphs 2 through 11 above.

14. A copy of all correspondence between you and any employee of Apex Companies, LLC regarding the properties identified in numbered paragraphs 1 through 11 above.

15. A copy of all correspondence between you and any attorney, staff member, employee or agent of NC DEQ regarding the properties identified in numbered paragraphs 1 through 11 above.

16. A copy of all correspondence between you and any attorney, staff member, employee or agent of any insurance company, agent or adjuster regarding the properties identified in numbered paragraphs 1 through 11 above.

17. A copy of all correspondence between you and any attorney, staff member, employee or agent of any and all laboratories regarding the properties identified in numbered paragraphs 1 through 11 above.

18. A copy of all correspondence between you and any attorney, staff member, employee or agent of any and all State of North Carolina governmental, regulator, or administrative entity regarding the properties identified in numbered paragraphs 1 through 11 above.

19. A complete copy of your fee structure in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

20. A complete copy of all invoices you have submitted for payment in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

21. A complete copy of all proof of payment made in satisfaction of the invoices identified in No. 17 in relation to any and all work performed in connection with the properties identified in numbered paragraphs 1 through 11 above.

22. A complete copy of all reports, information, records related to releases that have occurred at the Lexington Booster Station Property described above, including but not limited to above and

below ground releases, reported and known but unreported releases, and releases on or along the property, and all releases related to the properties identified in numbered paragraphs 2 through 11 above.

If, rather than producing the documents physically, you would prefer to electronically transfer the files, you may send them via a secure document link or via electronic mail to kmessersmith@wallacegraham.com, or via an electronic storage medium such as a flash drive or thumb drive.