IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JACKIE BRASWELL, JUDY BRASWELL, HAROLD COLLINS, BONNIE COLLINS, Individually and as Executor of the Estate of HOMER WADE YARBROUGH, HAYMON HICKS, PENNY HICKS, GINA MYERS SHAW, JAMES SLONE, DEBBIE SLONE, JERRY SMITH, KAREN SMITH, PAMELA LOVELESS, KATHY MILLER, JOEY SMITH and SHANIA SMITH, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | 1:18CV580 |
| v. | ) ) | |
| COLONIAL PIPELINE COMPANY, and APEX COMPANIES, LLC, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Apex Companies, LLC's Motion to Dismiss [Doc. #13]. Plaintiffs allege that Apex Companies, LLC ("Apex") was negligent and willful and reckless in response to a petroleum release near the Plaintiffs' property from a pipeline belonging to Defendant Colonial Pipeline Company ("Colonial"). Apex argues that Plaintiffs have failed to allege how Apex owed Plaintiffs a legal duty, how any action it took deviated from any duty of due care, and how any action proximately caused Plaintiffs' alleged injury. (Mot. to Dismiss at 2.) For the reasons explained below, the motion is granted.

According to the Complaint, Colonial "is the largest-volume pipeline transporter of refined petroleum products in the world, moving millions of gallons of petroleum products each day through an underground pipeline that stretches from" Texas to New Jersey and passes through North Carolina, among other states. (Compl. ¶ 35.)  Pumping or booster stations "are positioned throughout the length of the pipeline to adjust the pressure, keep the product moving, and monitor flow and other information." (Id. ¶ 44.)  A booster station "includes aboveground features and fixtures", "requires periodic adjustment and manipulation of equipment and parts", and has "a greater danger of incurring mechanical damage and operator error." (Id. ¶¶ 48, 49.)

"During the pertinent times[1]," Plaintiffs "resided on and used land in proximity to" Colonial's booster station near Lexington, North Carolina ("the Lexington Booster Station"). (Id. ¶ 2.)  On April 10, 2013, approximately 500 gallons "of hydraulic fluid was released to the soil in the manifold area [of the Lexington Booster Station] when an aboveground one-inch central hydraulic line failed." (Id. ¶ 57.)  "Upon information and belief," Colonial "retained Apex to engage in certain remedial and remediation efforts" in response to the release. (Id. ¶ 58.)  In addition, because Colonial "was required to submit a Comprehensive Site Assessment to the North Carolina Department of Environmental Quality

---

[1] It is unclear from the Complaint precisely what time period Plaintiffs consider to be the "pertinent times" because allegations surround both an April 2013 release and historical releases.

2

("NCDEQ"), it "retained" "Apex to conduct a site assessment report", according to which "[e]xcavation activities were completed to remove the source area." (Id. ¶¶ 60, 61.) Nevertheless, "soils remained containing constituents of concern ('COCs') above the North Carolina regulatory standards", and tests on soil samples collected by Apex on April 24 and May 22 showed contamination above regulatory standards. (Id. ¶¶ 61-65.) Accordingly, "Plaintiffs and their properties were directly exposed to and recurrently infiltrated by hazardous gases, chemicals, and industrial waste which caused damage to their properties and to the natural resources . . . in and around [their] properties". (Id. ¶ 3.)

Furthermore, soil, presumably[2] that "on the southern side of the manifold area", "had an odor more consistent with a tar-like substance" and surrounding soil had "high levels of contaminants". (Id. ¶ 67.) "Due to the relatively low migration characteristics of hydraulic oils, it was determined that significant, unreported historical spills had occurred at the [Lexington] Booster Station." (Id.) Yet, neither Apex nor anyone else was able "to identify any site reports pertaining to these historical releases at the [Lexington] Booster Station despite [Colonial's] duty" to report contaminant releases to regulatory agencies "and other stakeholders". (Id. ¶¶ 59, 68.) Records of the United States Department of Transportation's Office of Pipeline Safety evidence nearly 200 Colonial "contamination events and spills",

---

[2] It is not entirely clear to what area Plaintiffs refer when they state "[t]he soil" in paragraph 67 of the Complaint, but context suggests they are referring to the soil on the southern side of the manifold area. (See Compl. ¶¶ 66-67.)

3

including "a number of high-volume spills", between 1968 and 1996. (Id. ¶ 105; see also ¶¶ 107-114.)  Additional releases have occurred along the pipeline since 1996. (Id. ¶¶ 115-25, 135.)  A Consent Decree was entered in 2003 after the United States filed a complaint in 2000 against Colonial for gross negligence in violation of the Clean Water Act, the terms of which required Colonial to take certain action with respect to the pipeline. (Id. ¶¶ 126-32.)

Here, Plaintiffs allege that Colonial violated the Oil Pollution and Hazardous Substances Control Act of 1978 (First Claim for Relief), was negligent and willful and reckless (Second Claim for Relief), trespassed (Third Claim for Relief), created a private recurrent nuisance (Fourth Claim for Relief), and participated in ultrahazardous activity (Fifth Claim for Relief) for which Plaintiffs seek punitive damages (Sixth Claim for Relief) and declaratory and injunctive relief (Seventh Claim for Relief). (Id. ¶¶ 138-84.)  Pertinent to the instant motion is Plaintiffs' sole claim against Apex for negligence and willful and reckless conduct (Second Claim for Relief), (id. ¶¶ 147-53).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp.,

4

State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiffs and all reasonable inferences are drawn in their favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014). Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555.

The parties correctly apply North Carolina law. See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941), superseded by statute on other grounds (providing that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits); Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988) (recognizing that North Carolina's Supreme Court "has consistently adhered to the lex loci rule" and that "the state where the injury

5

occurred is considered the situs of the claim"). Under North Carolina law, the elements of a negligence claim are: a legal duty, a breach of that duty, and an injury that is proximately caused by that breach. Fussell v. N.C. Farm Bureau Mut. Ins. Co., Inc., 695 S.E.2d 437, 440 (N.C. 2010).

Apex first argues that despite the allegation that "Defendants had a duty to perform its [sic] activities on and around [Colonial's] property and the Plaintiffs' property with due care", (Compl. ¶ 148), there is no alleged basis for that duty. (Def. Apex's Br. in Supp. of its Mot. to Dismiss Pls.' Compl. at 5.) According to Apex, because Plaintiffs have not alleged that a statute created the duty, that Apex voluntarily provided service to Plaintiffs, or that Plaintiffs are beneficiaries of the contract between Apex and Colonial, "the only possible basis for a duty of care is through their status as a third party." (Id. at 5-6 (quoting Ingle v. Allen, 321 S.E.2d 588, 594 (N.C. Ct. App. 1984)[3]).) Yet, Apex argues, the allegations do not support such a duty. (Id. at 6-7.) Even if the allegations did support the existence of a duty, Apex further contends that "there is no factual allegation . . . that Apex breached that duty or . . . caused an injury to Plaintiffs." (Id. at 8-9.) Plaintiffs disagree and argue that they sufficiently alleged facts to support a duty, (Pls.' Resp. to Def. Apex's Mot. to Dismiss at 10-13), and that "the questions of breach and proximate cause should be left to the jury", (id. at 14).

---

[3] The full citation is Ingle v. Allen, 321 S.E.2d 588, 594 (N.C. Ct. App. 1984), overruled in part on other grounds Dep't of Transp. v. Rowe, 521 S.E.2d 707 (N.C. 1999).

6

As an initial matter, the materials attached to Apex's Reply Brief as Exhibit 1 will not be considered for purposes of the instant motion. A court may consider a document attached to a motion to dismiss if it is "integral to and explicitly relied on in the complaint and . . . plaintiffs do not challenge its authenticity." Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999). Apex describes the materials in Exhibit 1 to its Reply Brief as "[a] true and accurate copy of the contract incorporated by reference within Plaintiffs' Complaint and Response". (Def. Apex's Reply to Pls.' Resp. to Def. Apex's Mot. to Dismiss at 3.) Yet, it is not apparent that the materials in Exhibit 1 constitute the relevant contract between Apex and Colonial. Exhibit 1 consists of a Master Services Agreement entered into in October 2008, as well as Standard Purchase Orders. Furthermore, these materials were attached to Apex's Reply Brief – a document to which Plaintiffs have neither an obligation nor an automatic right to respond – and there is no indication that Plaintiffs agree to their authenticity, that they include the contract according to which Apex was retained after the April 2013 release, or that the Standard Purchase Orders have anything to do with the contract. Cf. Spencer v. Va. State Univ., No. 1:16cv331-HEH, 2016 WL 6902401 (E.D. Va. Nov. 23, 2016) (considering the copy of the faculty handbook that the defendants attached to their reply brief when the plaintiff had cited and quoted the handbook in her complaint in support of her discrimination claim and failed to identify in her subsequent motion to strike any discrepancy between the handbook she had quoted and the copy attached to the reply brief).

7

"The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm". Council v. Dickerson's, Inc., 64 S.E.2d 551, 553 (N.C. 1951). "[U]nder certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking." Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co., 268 S.E.2d 12, 15 (N.C. Ct. App. 1980) (citing Restatement (Second) of Torts § 324A (1965)). "This duty to protect third parties from harm arises under circumstances where the party is in a position so that 'anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or property of the other.'" Olympic Prods. Co. v. Roof Sys., Inc., 363 S.E.2d 367, 372 (N.C. Ct. App. 1988) (quoting Davidson & Jones, Inc. v. County of New Hanover, 255 S.E.2d 580, 584 (N.C. Ct. App. 1979)). Thus, the issue is whether Apex "rendered services to [Colonial] which it should have recognized were necessary for [Plaintiffs'] protection." Id.

Apex is alleged to have rendered services to Colonial, but those allegations are limited. While it was retained to conduct the site assessment report and engage in certain remediation efforts, neither the components of the report nor any description of the "certain remedial and remediation efforts" is alleged. Instead, Plaintiffs merely allege that excavation activities were completed, presumably by

Apex[4], and soil samples were collected for which test results showed contamination. By undertaking these activities, it is possible that Apex owed Plaintiffs a duty to exercise ordinary care; however, it is not apparent from the allegations that any activities that Apex did undertake – sampling soil and completing excavation activities of the source area – would cause danger of harm to Plaintiffs or their property if Apex failed to exercise ordinary care in so acting.

Even if Apex owed Plaintiffs a duty, there are no allegations that it breached its duty or harmed Plaintiffs. Apex is not alleged to have sampled soil without ordinary care so that Plaintiffs were harmed, nor is it alleged to have taken any particular remediation effort without exercising ordinary care so that Plaintiffs were harmed, especially in light of the Complaint's alleging nothing more than that Colonial retained Apex "to engage in certain remedial and remediation efforts."

There is no question that Plaintiffs often allege "Defendants" acted in ways that breached their duties. However, nearly all of those allegations, read in context with the Complaint as a whole, are directed at Colonial. (Compare, e.g., Compl. ¶ 4 ("Defendants' conduct caused . . . the release, spill, and discharge . . . " & "Defendants' negligent pattern and practice of releasing petroleum . . . "), ¶ 5 ("Defendants continue to pump through the line . . ." & "Defendants have failed to take adequate steps to manage releases"), ¶ 6 (referring to "Defendants' ongoing

---

[4] This allegation uses the passive voice with no actor, but in context and in the light most favorable to Plaintiffs, Apex is presumed to have conducted the excavation.

releases"), ¶ 73 (alleging failure "to adequately inform Plaintiffs about migrating contamination" and "to accurately explain the significant amounts of contaminates"), ¶ 81 (alleging "Defendants' failure to identify and control release sites" and refusal "to identify the release sites"), ¶ 83 (alleging "Defendants have withheld significant information regarding contamination . . . and have not properly provided notice to all Plaintiffs . . . ") with id. ¶ 60 (alleging Colonial's obligation to submit a Comprehensive Site Assessment to NCDEQ), ¶ 68 (alleging Colonial's duty to monitor and report), ¶ 69 (alleging that Colonial did not alert Plaintiffs of releases), ¶ 72 (criticizing Colonial's "handling" of spills at the Lexington Booster Station and alleging that Colonial was responsible for the April 2013 release), ¶¶ 105-126 (alleging a history of releases along Colonial's pipeline) (emphasis added).

This distinction is even more apparent in the primary paragraph within the Second Claim for Relief in which "Defendants" allegedly violated their duty "in connection with" the control and maintenance of the pipeline; preventing contamination, releases, and spills; adequately investing in prevention in light of "numerous past incidents at [Colonial] sites"; and warning and notifying Plaintiffs. (Id. ¶ 149.) Within that same paragraph, it is Colonial that allegedly failed to act diligently "to survey for potential problems and correct existing ones" at the Lexington Booster Station and "failed to invest in appropriate measures". (Id. ¶¶ 150-51.) Apex is only specifically identified when it is alleged to be "jointly and severally liable given its involvement in the facts and circumstances herein and

10

in light of its professed expertise in engineering, contamination, and remediation matters." (id. ¶ 152.)  "When two or more proximate causes join and concur in producing the result complained of, the author of each cause may be held for the injuries inflicted" and "are jointly and severally liable." Hairston v. Alexander Tank & Equip. Co., 311 S.E.2d 559, 565-66 (N.C. 1984); see also Phillips v. Hassett Mining Co., 92 S.E.2d 429, 433 (N.C. 1956).  However, because Plaintiffs have failed to state a claim of negligence against Apex, it is not liable to Plaintiffs.

At other times, Plaintiffs allege non-action against "Defendants" such as a failure to submit site reports to NCDEQ" and "CSA Report addendum", and a failure "to take action", (id. ¶ 73), but this non-action does not create a duty here.

Among the allegations is that "one or both of Defendants" "[f]ailed to take adequate measures to remediate the contaminated water and soil affected by the historic spills", (id.), but Apex was retained "to engage certain remedial and remediation efforts" "when that [April 2013] spill occurred", (id. ¶ 58 (emphasis added)), and there are no factual allegations about any work Apex was supposed to do with respect to the historic spills.  While "one or both of Defendants" allegedly failed "to undertake other appropriate remedial actions in light of the fact that further excavation became not feasible due to the extent of contamination on the properties, and in light of the fact that" contamination was detected in other areas, (id. ¶ 73), there is no allegation of what "certain remedial and remediation efforts" Apex was retained to do such that it can be inferred what it is Apex did without exercising ordinary care.  The only allegation in the primary paragraph of

11

the Second Claim for Relief that is plausibly related to Apex is that "Defendants violated their duty of care . . . in connection with the relevant work activities . . . to remediate contamination . . . "; however, this allegation is just as conclusory and vague. Even more obviously, there is no factual allegation of how Apex's sampling of soils was done without the exercise of ordinary care.

In sum, even if Apex owed a duty of care to Plaintiffs by undertaking services to Colonial, there are no factual allegations that it undertook those services without exercising ordinary care such that Plaintiffs were proximately harmed. Not only are the allegations insufficient to state a plausible claim for negligence, but, so, too, are they insufficient to state a plausible claim of willful and reckless conduct, also alleged in the Second Claim for Relief, see Yancey v. Lea, 550 S.E.2d 155, 157 (N.C. 2001) (defining "gross negligence" as "wanton conduct done with conscious or reckless disregard for the rights and safety of others", a "wanton act" as one "done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others", and "willful negligence" as involving "a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another").

For the reasons explained in this Memorandum Opinion and Order, IT IS HEREBY ORDERED that Defendant Apex Companies, LLC's Motion to Dismiss [Doc. #13] is GRANTED.

This the 2nd day of April, 2019.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge