IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JACKIE BRASWELL, JUDY BRASWELL,    )
HAROLD COLLINS, BONNIE COLLINS,    )
Individually and as Executor of the    )
Estate of HOMER WADE YARBROUGH,    )
HAYMON HICKS, PENNY HICKS,    )
GINA MYERS SHAW, JAMES SLONE,    )
DEBBIE SLONE, JERRY SMITH,    )
KAREN SMITH, PAMELA LOVELESS,    )
KATHY MILLER, JOEY SMITH and    )
SHANIA SMITH,    )                    1:18CV580
    )
            Plaintiffs,    )
    )
    v.    )
    )
COLONIAL PIPELINE COMPANY, and    )
APEX COMPANIES, LLC,    )
    )
            Defendants.    )

## MEMORANDUM OPINION AND ORDER

This action arises from alleged damage to Plaintiffs' properties after several

petroleum releases at a booster station in Lexington, North Carolina owned and

operated by Defendant Colonial Pipeline Company ("Colonial"). Plaintiffs allege

against Colonial a violation of North Carolina's Oil Pollution and Hazardous

Substances Control Act of 1978 ("OPHSCA") (First Claim for Relief), negligence

and willful and reckless conduct (Second Claim for Relief), trespass (Third Claim for

Relief), private recurrent nuisance (Fourth Claim for Relief), and strict liability for

ultrahazardous activity (Fifth Claim for Relief), for which they seek punitive

damages (Sixth Claim for Relief) and declaratory and injunctive relief (Seventh

Claim for Relief).  Before the Court is Colonial's Motion to Dismiss, [Doc. #15],

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Colonial argues

that the statute of repose bars Plaintiffs' claims based on historical releases[1],

Plaintiffs have failed to allege injury from the April 2013 release, North Carolina

law does not recognize a strict liability claim under these circumstances, and

Plaintiffs have failed to plead sufficiently the essential elements of gross negligence

and punitive damages.  For the reasons that follow, the motion is granted in part

and denied in part.

I.

As alleged in the Complaint, Colonial "is the largest-volume pipeline

transporter of refined petroleum products in the world, moving millions of gallons

of petroleum products each day through an underground pipeline" from Texas to

New Jersey passing through North Carolina, among other states. (Compl. ¶ 35.)

Because "the pipeline is thousands of miles long", "pumping stations or booster

stations are positioned throughout the length of the pipeline to adjust the pressure,

keep the product moving, and monitor flow and other information." (Id. ¶¶ 43,

44.)  A booster station "includes aboveground features and fixtures" and has "a

greater danger of incurring mechanical damage and operator error." (Id. ¶¶ 48,

---

[1] But compare Mot. to Dismiss ¶ 2 ("Any claims Plaintiffs may have had against
Colonial are barred by the statute of repose. . . .") (emphasis added) with Mem. of
Law in Supp. of Mot. to Dismiss at 5 ("Plaintiffs' claims based on the Prior
Releases are barred by North Carolina's strict statute of repose.").

49.)  One such booster station is at 667 Helmstetler Road in Lexington, North Carolina ("the Lexington Booster Station"). (E.g., id. ¶ 50.)

"During the pertinent times"[2], Plaintiffs "have resided on and used land in proximity to [Colonial's] Lexington Booster Station".[3] (Id. ¶ 2.)  On April 10, 2013, approximately 500 gallons of "hydraulic fluid was released to the soil in the manifold area [of the Lexington Booster Station] when an aboveground one-inch central hydraulic line failed." (Id. ¶ 57.)  Colonial retained Defendant Apex Companies LLC[4] "to engage in certain remedial and remediation efforts" and "conduct a site assessment report." (Id. ¶¶ 58, 61.)  Excavation activities were completed, but soil containing "constituents of concern" above North Carolina's regulatory standards, known as the 2L and 2B standards, remained. (Id. ¶ 61.)  These constituents of concern included benzene, toluene, ethylbenzene, xylenes, and naphthalene, while dichloromethane was also measured above "Gross Contamination Levels". (Id. ¶ 62.)  Contaminants exceeded "Soil-to-Groundwater" "maximum soil contaminant concentrations" and Industrial Health Based

---

[2] It is unclear to what times this phrase refers because Plaintiffs complain about historical releases and an April 2013 release.

[3] This allegation highlights the problems caused by the vagueness of the phrase "during the pertinent times".  For example, Homer Wade Yarbrough, whose estate is represented in the instant action by its executor, is alleged to have lived at 247 Yarborough Drive, property more recently owned by Plaintiffs James and Debbie Slone, until 1978. (Compl. ¶ 104.)  However, Plaintiffs allege that prior releases at the Lexington Booster Station occurred only as far back as 1989.  Somewhat more perplexing, considering Yarbrough is alleged to have lived at 247 Yarborough Drive until 1978, is another allegation that Plaintiffs Harold and Bonnie Collins lived with him "in the late 1990's" apparently at that property. (Id. ¶ 89.)

[4] Apex Companies LLC was dismissed by an earlier Order of this Court.

Standards, and results from fourteen of twenty-one monitoring wells were above 2L and 2B standards. (Id.)  All soil samples taken on April 24 contained "total petroleum hydrocarbon diesel range organics" exceeding the "action level" of the North Carolina Department of Environmental Quality ("NCDEQ"), as did additional samples taken from a new site on May 22. (Id. ¶¶ 63-65.)

"The highest levels" were found on the "southern side of the manifold area" where the soil's[5] odor was more akin to a tar-like substance. (Id. ¶¶ 66-67.)  "Due to the relatively low migration characteristics of hydraulic oils, it was determined that significant, unreported historical spills had occurred at the [Lexington] Booster Station."  (Id. ¶ 67.)  Yet, Apex could not identify any site reports related to those historical releases, and "[n]ever during the pertinent times did [Colonial] alert nearby Plaintiff property owners of the releases of contaminants". (Id. ¶¶ 68, 69.) Nevertheless, "[u]pon [Plaintiffs'] information and belief, [Colonial's] documents indicate that the [Lexington] Booster Station had four prior releases dating back to 1989." (Id. ¶ 56.)

More recent sampling from July 2017 detected five contaminants in surface water above "laboratory detection limits". (Id. ¶ 75.)  In December 2017, two contaminants were detected in surface water above "laboratory detection limits" and fifteen constituents of concern were detected in water supply wells above 2L standards. (Id. ¶¶ 76-77.)

---

[5] It is unclear to what "soil" Plaintiffs are referring in paragraph 67, but, in context, the reference appears to be to the soil on the southern side of the manifold area.

Plaintiffs Pam Loveless, Kathy Miller, and Karen Smith jointly own property at 551 Helmstetler Road after inheriting it in 2017. (Id. ¶¶ 92, 98.) February 26, 2016 sampling results revealed "petroleum fuel-related contaminants" in the groundwater beneath that property. (Id. ¶¶ 93, 95.) Specifically benzene levels tested well above the "permitted level". (Id. ¶¶ 93, 95.) March 28, 2017 sampling results similarly detected the presence of "petroleum fuel-related contaminants" in the groundwater approximately forty feet beneath the property in amounts that exceed the 2L standards. (Id. ¶¶ 93, 99.) The well water had been used for years to water the family's garden on the property. (Id. ¶ 98.)

Plaintiffs James and Debbie Slone own property at 247 Yarborough Drive which has two wells – one active and the other abandoned due to contamination. (Id. ¶ 101.) On December 4, 2017, the Slones received a letter from Colonial informing them that sampling results from their water supply well showed "petroleum fuel-related compounds" in the groundwater approximately twenty-two feet beneath their property at levels exceeding 2L standards. (Id. ¶ 102.)

Plaintiffs Jackie and Judy Braswell and Harold and Bonnie Collins have suffered the loss of use and value of their property as a result of Colonial's conduct. (Id. ¶¶ 85-90.) Plaintiffs Haymon and Penny Hicks' property "has existing environmental concerns, including but not limited to, deep groundwater contamination." (Id. ¶ 91.) Similarly, Plaintiffs Joey and Shania Smith's property, which the pipeline crosses, "has existing environmental concerns, including but not limited to, shallow and deep water contamination, [and] potential vapor intrusion

concerns". (Id. ¶ 103.) Property that Plaintiff Gina Myers Shaw owns is inside "the contamination plume". (Id. ¶ 100.)

Plaintiffs allege that "[d]uring the pertinent times", Colonial failed "to take adequate measures to remediate the contaminated water and soil affected by the historic spills", "to adequately inform Plaintiffs about the migrating contamination and . . . to accurately explain the significant amounts of contaminants found in the area", "to submit site reports to NCDEQ", to submit "CSA Report" addenda, and "to take action" so that contaminated soils would not remain on site. (Id. ¶ 73.) Because Colonial failed "to identify and control the release sites", there have been "recurrent[] releases". (Id. ¶ 81.)

II.

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant

is liable for the misconduct alleged").  However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557).  When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiffs and all reasonable inferences are drawn in their favor. <u>U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency</u>, 745 F.3d 131, 136 (4th Cir. 2014).  Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. <u>Twombly</u>, 550 U.S. at 557.  In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". <u>Id.</u> at 555.  Both parties apparently presume North Carolina law applies to Plaintiffs' claims, and the Court agrees. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.</u>, 313 U.S. 487, 496 (1941), <u>superseded by statute on other grounds</u> (providing that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits); <u>Boudreau v. Baughman</u>, 368 S.E.2d 849, 854 (N.C. 1988) (recognizing that North Carolina's Supreme Court "has consistently adhered to the lex loci rule" and that "the state where the injury occurred is considered the situs of the claim").

### A.

First, Colonial argues that North Carolina's applicable statute of repose bars Plaintiffs' claims based on the historical releases, which Colonial defines as the

7

"Prior Releases". (Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Br. in Supp.")

at 5-9.)  A statute of limitation creates "'a time limit for suing in a civil case, based

on the date when the claim accrued'", but a statute of repose "puts an outer limit

on the right to bring a civil action . . . measured . . . from the date of the last

culpable act or omission of the defendant." CTS Corp. v. Waldburger, 573 U.S. 1,

7, 8 (2014) (quoting Black's Law Dictionary 1546 (9th ed. 2009)).  It "'bar[s] any

suit that is brought after a specified time since the defendant acted . . . , even if

this period ends before the plaintiff has suffered a resulting injury.'" Id. (quoting

Black's 1546) (alteration in original).  In other words, a statute of repose is "'a

cutoff'" or "'absolute bar' on a defendant's temporal liability". Id. (quoting Lampf,

Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991) & 54

C.J.S., Limitations of Actions § 7, p. 24 (2010)).

North Carolina law provides that "no cause of action [for physical damage to

claimant's property] shall accrue more than 10 years from the last act or omission

of the defendant giving rise to the cause of action." N.C. Gen. Stat. § 1-52(16).

This statute of repose, which applies to Plaintiffs' claims, Wilson v. McLeod Oil

Co., Inc., 398 S.E.2d 586, 513-14 (N.C. 1990), "defines substantive rights to

bring an action", Colony Hill Condo. I Ass'n v. Colony Co., 320 S.E.2d 273, 276

(N.C. Ct. App. 1984).  "Failure to file within that period gives the defendant a

vested right not to be sued." Id.

Effective June 20, 2014, the General Assembly amended this statute to

create an exception for injury "caused or contributed to by groundwater

8

contaminated by a hazardous substance, pollutant, or contaminant", which means that "the concentration of the hazardous substance, pollutant, or contaminant exceeds a groundwater quality standard set forth in" North Carolina regulations. N.C. Gen. Stat. § 130A-26.3. This exception applies to actions "filed, arising, or pending" on or after June 20, 2014. 2014 N.C. Sess. Laws 2014-44, § 1(c) (amending 2014 N.C. Sess. Laws 2014-17, § 4). However, because a statute of repose is substantive in nature, § 130A-26.3 does not apply retroactively; to do so would "divest [Colonial] of a vested right," Bryant v. United States, 768 F.3d 1378, 1385 (11th Cir. 2014) (applying North Carolina law to multi-district litigation arising from alleged exposure to toxic substances in drinking water at Marine Corps Base Camp Lejeune). See also Colony Hill Condo. I Ass'n, 320 S.E.2d at 276 ("Once the . . . statute of repose barred the plaintiffs' suit, . . . a subsequent statute could not revive it" because "a vested right cannot be impaired by the retroactive effect of a later statute.").

    "While equitable doctrines may toll statutes of limitations, they do not toll substantive rights created by statutes of repose." Monson v. Paramount Homes, Inc., 515 S.E.2d 445, 449 (N.C. Ct. App. 1999). Stated another way, a statute of repose like that in § 1-52(16) containing "'no action' language" bars "all claims, including claims seeking to extend liability for subsequent repairs or remedial measures." Hodge v. Harkey, 631 S.E.2d 143, 146 (N.C. Ct. App. 2006). "To allow the statute of repose to toll or start running anew each time a repair is made would subject a defendant to potential open-ended liability for an indefinite period

of time, defeating the very purpose of statutes of repose". <u>Monson</u>, 515 S.E.2d at 449.

In support of its motion to dismiss, Colonial attaches an Interim Comprehensive Site Assessment Report from Apex Companies LLC to NCDEQ dated March 7, 2016 as evidence of the dates of the Prior Releases. (<u>See</u> Ex. A to Def.'s Br. in Supp.)  Colonial argues that the report is integral to and expressly referenced in the Complaint such that it may be considered. (Def.'s Br. in Supp. at 7 n.3 (citing Compl. ¶¶ 9, 64).)  A document is integral to the complaint when "its very existence, and not the mere information it contains, gives rise to the legal rights asserted." <u>Walker v. S.W.I.F.T. SCRL</u>, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007).  Integral documents include those containing alleged material misrepresentations in a fraud action, an article reporting alleged fraudulent statements in a securities fraud action, and an alleged libelous magazine article in a libel action based on that article. <u>Id.</u>  Here, not only does the Complaint not expressly reference this thirty-page interim report, its very existence does not give rise to Plaintiffs' causes of action.  Therefore, it is not being considered for purposes of this motion to dismiss.

Nevertheless, Plaintiffs do allege "four prior releases dating back to 1989." (Compl. ¶ 56.)  In opposition to Colonial's motion, Plaintiffs essentially argue that Colonial's "liability is based on **all of its acts and omissions in the ten year period** – not just whether a given contaminant release occurred in that time." (Pls.' Resp. to Def. Colonial's Mot. to Dismiss at 6 ("Pls.' Resp. in Opp'n").)  According to

Plaintiffs, Colonial "had a duty to protect against, identify and remediate leaks, which extended over those ten years regardless of when a particular leak occurred." (Id.)  Plaintiffs rely upon Adams v. A.J. Ballard Jr. Tire & Oil Co., No. 01CVS1271, 2006 WL 1875965 (N.C. Super. Ct. June 30, 2006) (Tennille, J.), for the proposition that "[f]acility owners have a duty to remediate" and "'[f]ailure to do so may result in liability arising from the failure to remediate and not the leak itself.'" Pls.' Resp. in Opp'n at 7 (second alteration in original).

In Adams, the plaintiffs alleged contamination of wells and water supply from leaking underground storage tanks.  The Underground Storage Tank section of the Waste Management division of the North Carolina Department of Environmental and Natural Resources "regulates most underground storage tanks in the state." Adams, 2006 WL 1875965, at *9; see also id. at *9-10 (detailing the application of the regulatory scheme when there is a leak from an underground storage tank).  Applying that regulatory scheme, the Adams court found that a "tank owner" had the responsibility to remediate and that a tank owner's failure to remediate "may" result in liability from the failure to remediate. Id. at *23.

Not only is Adams an opinion authored by North Carolina's Superior Court and, therefore, not precedential, but the underground storage tank regulations the Adams court analyzed do not appear to apply here and the most likely applicable regulations do not create a duty to remediate that would overcome the statute of repose.  As is relevant here, North Carolina's Environmental Quality regulations govern surface water standards (Subchapter 2B of Title 15A), groundwater

11

standards (Subchapter 2L of Title 15A), and underground storage tanks (Subchapter 2N of Title 15A). There is no allegation that the Lexington Booster Station or Colonial's pipeline is an underground storage tank, and, other than Plaintiffs' reliance on Adams for the general proposition that facility owners may be liable for failing to remediate, there is no argument that regulations governing underground storage tanks apply here. And, neither party has specifically addressed the proper characterization for regulatory purposes of the Lexington Booster Station or Colonial's pipeline. There are, however, allegations that contaminants exceeded "2L and 2B standards". Subchapter 2L not only provides abatement, assessment, and remediation procedures for owners and operators of underground storage tanks, but also for owners and operators of "non-UST[s]". 15A N.C. Admin. Code 2L.0404, .0408 (underground storage tanks); 15A N.C. Admin. Code 2L.0504, .0508 (non-USTs). The regulations define "Non-UST" as it is defined in N.C. Gen. Stat. § 143-215.104AA(g), which refers to "aboveground storage tanks and other sources not otherwise governed by the provisions of [N.C. Gen. Stat. §] 143-215.94V" which concern underground storage tanks. 15A N.C. Admin. Code 2L.0502(4). Accordingly, in its initial response to a petroleum release, an owner of a non-UST must "take action[] to prevent any further discharge or release . . .; identify and mitigate any fire, explosion, or vapor hazard; and report the release within 24 hours of discovery". 15A N.C. Admin. Code 2L.0504(1). The owner must also "perform initial abatement actions to measure for the presence of a release . . . and confirm the precise source . . . ; to

investigate to determine the possible presence of free product and to begin free

product removal; and to continue to monitor and mitigate any additional fire,

explosion, or vapor hazards; and submit a report . . . within 20 days after release

confirmation". 15A N.C. Admin. Code 2L.0504(2).  The "contaminated soil that

would act as a continuing source of contamination to groundwater" must also be

removed, an initial site assessment must be conducted, and an "initial assessment

and abatement report" must be submitted within 90 days of the discovery of the

release. 15A N.C. Admin. Code 2L.0504(3)-(5).

In addition, to address "[a]ssessment and remediation of soil contamination",

an owner must "submit a report . . . assessing the vertical and horizontal extent of

soil contamination." 15A N.C. Admin. Code 2L.0508(2).  If the release is classified

as low risk, the owner must "submit a report demonstrating that soil contamination

has been remediated to either the residential or industrial/commercial maximum soil

contaminant concentration established . . . pursuant to Rule .0511 . . . whichever

is applicable", and, if the release is classified as high or intermediate risk, the

submitted report must "demonstrat[e] that soil contamination has been remediated

to the lower of: (a) the residential or industrial/commercial maximum soil

contaminant concentration, whichever is applicable, that has been established . . .

pursuant to Rule .0511 . . . ; or (b) the 'soil-to-groundwater' maximum soil

contaminant concentration that has been established . . . pursuant to Rule 0.511".

N.C. Admin. Code 2L.0508(3), (4).  Nothing in these regulations creates such a

duty to remediate that each failure to do so constitutes its own last omission

necessary to start the running of the statute of repose for that omission.  Instead, the regulations require that the owner of a non-UST take certain action, which includes remediation, and report said action and its results to the governing body. The failure to do so <u>at the time it was required</u> would trigger the running of the statute of repose, but, as explained earlier, <u>supra</u> 9-10, under other circumstances, continued efforts to address an injury do not start the statute of repose anew.

The plaintiffs in <u>Hodge</u> made a similar argument as Plaintiffs do here. Underground storage tanks released petroleum products that contaminated the plaintiffs' property and water supply. 631 S.E.2d at 144.  In response to the plaintiffs' suit, the defendants moved for summary judgment on the application of the statute of repose. <u>Id.</u> at 144-45.  The plaintiffs argued that the statute of repose did not bar their action because the defendants had "an ongoing responsibility for the contamination and therefore, [the] defendants ha[d] yet to perform the last act or omission for purposes of the application of the statute of repose." <u>Id.</u> at 145.  The court disagreed and noted that the plaintiffs cited "no statutory authority which creates in defendants an 'ongoing responsibility,' nor was [the] [c]ourt able to discover any." <u>Id.</u>

Furthermore, the <u>Adams</u> opinion appears inconsistent with North Carolina appellate decisions and federal courts applying those decisions which have repeatedly found that § 1-52(16) bars all claims, even those for "subsequent repairs or remedial measures."  Finally, the 2014 amendment to § 1-52(16) excepting injury caused by groundwater contaminated by a hazardous substance,

14

pollutant, or contaminant also suggests that each failure over time to remediate contamination from past releases does not begin its own statute of repose.

Plaintiffs argue that the statute of repose does not bar its OPHSCA claim because Colonial has "had control over the facility within the last ten years", (Pls.' Resp. in Opp'n at 14; see also id. (describing Colonial as having "ownership and control over the last ten years")), a position that Colonial is not challenging. Colonial's argument focuses instead on alleged releases that took place more than ten years before the filing of the instant action.

Plaintiffs further argue that their nuisance and trespass claims are not barred because when "contamination and seepage . . . is recurrent, courts have found that neither the three-year statute of limitations nor the statute of repose applies to bar the claim; rather, the time period for damages at trial may be limited to the three-year window." (Id. at 15 (citing Wilson, 398 S.E.2d at 596 & Anderson v. Town of Waynesville, 164 S.E. 583 (N.C. 1932)).) Similarly, they argue that "[t]he ten-year statute of repose triggered by the 'last act' of the defendant that causes the harm does not apply where recurring acts both precede, and fall after, the ten-year cutoff date." (Id. at 15-16 (citing J&P Dickey Real Estate Family Ltd. P'ship v. Northrop Grumman Guidance & Electrs. Co., Inc., No. 2:11CV37, 2012 WL 925015 (W.D.N.C. Mar. 19, 2012)).) Plaintiffs conflate the concepts of statutes of limitation and statutes of repose in Wilson and exaggerate the holding in J&P Dickey Real Estate.

The <u>Wilson</u> court was tasked with determining whether the applicable statute of limitations and statute of repose barred the plaintiffs' claims. It first addressed the statute of limitations issue and analyzed <u>Spilman v. Navigation Co.</u>, 74 N.C. 675 (1876), in which water from the defendant's canal "oozed through the canal banks and over plaintiffs' land" flooding it "anew every day", <u>Roberts v. Baldwin</u>, 66 S.E. 346 (N.C. 1909), in which the defendant's ditch diverted water on the plaintiff's land and "flooded repeatedly", and <u>Whitfield v. Winslow</u>, 268 S.E.2d 245 (N.C. Ct. App. 1980), in which the defendant's dam created a pond on the plaintiff's property which "remained submerged even at the commencement of [the] action". 398 S.E.2d at 595-96. The court found that the facts before it constituted a renewing, as opposed to continuing, trespass and nuisance for purposes of <u>the statute of limitations</u>. <u>Id.</u> at 596. As Plaintiffs noted, the court did limit the plaintiff's damages to those arising during the three years immediately preceding the filing of the action because she had waited more than three years after she discovered the contamination to institute suit. <u>Id.</u> Again, though, that determination was in the context of applying the statute of limitations to the plaintiff's claim. The court had no trouble separately applying the statute of repose to bar the third-party complaint against individual defendants who had sold their property more than ten years before the suit was commenced and against the oil company who had last serviced the property more than ten years before the action was filed. <u>Id.</u> at 597.

The plaintiffs in J&P Dickey Real Estate alleged that hazardous chemicals leaked from underground storage tanks on the defendant's property and the contamination migrated to the plaintiffs' property. 2012 WL 925015, at *1. When asked to dismiss the OPHSCA, nuisance, trespass, and negligence claims as barred by the statute of repose, the court did not say that the statute of repose did not apply, as Plaintiffs argue. Instead, the court could not determine as a matter of law from the allegations in the complaint whether or not the statute of repose barred the plaintiffs' claims. Id. at *7.

More informative is the court's opinion in In re Camp Lejeune North Carolina Water Contamination Litigation, 263 F. Supp. 3d 1318 (N.D. Ga. 2016). The plaintiffs alleged exposure to toxic substances in the water supply while they lived at Marine Corps Base Camp Lejeune when the government failed to monitor the water supply quality and failed to provide notice of the contaminated water. Id. at 1325. Because the affected wells were removed from service in 1987 and the earliest any plaintiff filed suit was in 1999, the statute of repose would have barred the suit. Id. at 1339. To avoid that result, the plaintiffs argued that the government continued to make omissions during the ten-year period of repose and newly discovered evidence of contamination having occurred elsewhere on base created a recent duty to warn claim not time-barred. Id. According to the plaintiffs, reliable testing was not reported until 2010, and the government covered up the causal link between the contamination and injuries, continued trying to convince the plaintiffs that there was no link between the contamination and

injuries, repeatedly attempted to hide information about the contamination, and did not notify victims of potential contamination until 2008. Id. The government contended that the claims were nevertheless still barred "because the statute of repose does not run anew with every occurrence of continuing acts or omissions that fail to ameliorate an injury". Id. Citing Hodge and Monson, the court agreed and found "that any failure to warn claims – including the alleged 'renewed' duty to warn of the release [elsewhere on base for which evidence was newly discovered] – do not 'toll' or restart the statute of repose." Id. at 1340.

Understandably Plaintiffs compare their case to those involving leaks of hazardous materials that contaminated the groundwater and soil on the various plaintiffs' properties. However, here, the factual allegations are distinguishable. Plaintiffs allege an April 2013 release from the Lexington Booster Station and "four prior releases dating back to 1989." They filed this action on May 25, 2018. Certainly Plaintiffs' claims are not barred by the statute of repose to the extent they rely on the April 2013 release. As for the prior releases, the analysis is more involved. Once ten years passed after a release and legal action had not been commenced, Colonial's right to be free from liability for that release vested. Until that ten years passed, though, there was no vested right. Section 130A-26.3 became effective June 20, 2014. Colonial's right to be free from liability would have vested at that point for any release occurring on or before June 20, 2004 for which Plaintiffs had not yet commenced suit. However, no such right would yet have vested for any release occurring after June 20, 2004, and § 130A-26.3

would apply, as Colonial recognizes, (Def.'s Br. in Supp. at 9; Def. Colonial's Reply Br. in Supp. of its Mot. to Dismiss at 7 n.5). In other words, the statute of repose bars Plaintiffs' claims to the extent they are based on releases occurring on or before June 20, 2004.

B.

Next, Colonial argues that Plaintiffs have failed to state a claim based on the April 2013 release because they have not alleged that release caused any of their injuries. (Def.'s Br. in Supp. at 9-10.) Colonial contends that Plaintiffs have not alleged that "released hydraulic fluid impacted groundwater, migrated off of the Lexington Booster Station's property, or injured their properties. (Id. at 10 (citing Compl. ¶¶ 56-72).) Plaintiffs interpret Colonial's argument to be that the "2013 release cannot support liability because it was minimal", (Pl.'s Resp. in Opp'n at 9), which is not the Court's understanding of Colonial's position.

There is no dispute that a necessary element of Plaintiffs' OPHSCA, negligence and willful and reckless conduct, trespass, and nuisance claims is proximate cause. See N.C. Gen. Stat. § 143-215.93 (providing for liability for damage caused by oil or other hazardous substances); Parker v. Town of Erwin, 776 S.E.2d 710, 729-30 (N.C. Ct. App. 2015) (applying elements of a negligence claim); Ross v. Tenn. Commercial Warehouse, Inc., No. 3:14-cv-391-FDW-DCK, 2014 WL 4672424, at *2 (W.D.N.C. Sept. 18, 2014) (applying elements of a gross negligence claim); Singleton v. Haywood Elec. Membership Corp., 588

S.E.2d 871, 874 (N.C. 2003) (applying elements of a trespass claim); <u>Jordan v. Foust Oil Co., Inc.</u>, 447 S.E.2d 491, 498 (N.C. Ct. App. 1994) (defining nuisance).

Colonial's reading of the Complaint is too narrow. Plaintiffs have alleged that sampling results from February 26, 2016 and March 28, 2017 show the presence of "petroleum fuel-related contaminants in the groundwater beneath the property located at 551 Helmstetler Road", which is jointly owned by Pam Loveless, Kathy Miller, and Karen Smith. Benzene levels far exceeded the permitted level, and contaminants exceeded the 2L standards. Colonial notified James and Debbie Slone on December 4, 2017 that samples from their water supply well revealed petroleum fuel-related compounds that exceeded 2L standards in the groundwater beneath their property at 247 Yarborough Drive. Evidence obtained during discovery will likely indicate whether or not the April 2013 release caused the contamination on these properties and whether or not Yarbrough's estate can recover for any such injury, <u>see</u> <u>supra</u> n. 3, but for purposes of the instant motion, these Plaintiffs have sufficiently alleged damage from that release.

As for the remaining Plaintiffs, the allegations of causation are less clear. The Complaint describes at length the Braswells' and Collinses'[6] connection to their properties, but those allegations are not a model of clarity when determining the sufficiency of causation allegations (or damages for that matter) as they relate

---

[6] The Collinses are alleged to "reside" on their property. They are not alleged to own the property, while other Plaintiffs are alleged to own their respective properties.

to the April 2013 release.  However, each of those Plaintiffs is alleged to have

suffered "a loss of use and enjoyment and property value as a direct and proximate

cause result of [Colonial's] conduct, actions and inactions."  For purposes of the

instant motion, such allegations in their context sufficiently allege causation from

the April 2013 release.

The Hickses' and Smiths'[7] properties allegedly have "existing environmental

concerns" such as groundwater contamination and potential vapor intrusion.

Similarly, Shaw's property has allegedly "been directly affected by the ongoing

releases" and is inside "the contamination plume".  Read in the light most

favorable to these Plaintiffs, the allegations sufficiently allege property damage

which could have resulted from the April 2013 release.

C.

Next, Colonial argues that North Carolina does not recognize a cause of

action for strict liability under these facts. (Def.'s Br. in Supp. at 10-11.)  North

Carolina law recognizes strict liability for damages resulting from ultrahazardous

activities "'because the risk of serious harm cannot be eliminated with reasonable

care.'" Fagundes v. Ammons Dev. Grp., Inc., 820 S.E.2d 350, 356 (N.C. Ct. App.

2018) (quoting Jones v. Willamette Indus., Inc., 463 S.E.2d 294, 298 (N.C. Ct.

App. 1995)).  "'To date, blasting is the only activity recognized in North Carolina

as ultrahazardous.'" Id. (quoting Jones, 463 S.E.2d at 298).  Plaintiffs respond

_____

[7] The Smiths are alleged to "live" at this property.  They are not alleged to own
that property, while other Plaintiffs are alleged to own their respective properties.

that "even if there is no self-standing common law claim for strict liability, there is a statutory claim" under OPHSCA, and they "ask that the allegations found under Count Five be read as further support for the statutory claim pled at Count One." (Pls.' Resp. in Opp'n at 18.)  As Plaintiffs appear to concede, they have not stated a claim for strict liability as it is alleged in the Fifth Claim for Relief.

D.

Colonial also challenges the sufficiency of the allegations in support of Plaintiffs' claim of gross negligence and argues that the pattern and practice allegations "cannot serve as the basis for a gross negligence claim under North Carolina law." (Def.'s Br. in Supp. at 11.)  It contends that the "historical incidents" "have no bearing on Colonial's alleged conduct in this case" because they are "unrelated incidents from as early as 1970 and as far away as Texas". (Id. at 12.)  Plaintiffs respond that their allegations show "a large company that willfully failed to carry out its duties as a pipeline facility owner", "serious contaminant releases", and no requisite records. (Pls.' Resp. in Opp'n at 19.) Plaintiffs also argue that Colonial "knew that water supply wells were located a short distance of 1,500 feet away from the recent release", (id. at 20 (citing Compl. ¶ 70)), but Plaintiffs merely alleged the location of the wells, not Colonial's knowledge of their location.  They do, however, allege that Colonial "has been well aware of the nearby presence of families and owners of private property" "[d]uring all the years of its operation". (Compl. ¶ 71.)

North Carolina's Supreme Court "has often used the terms 'willful and wanton conduct' and 'gross negligence' interchangeably". Yancey v. Lea, 550 S.E.2d 155, 157 (N.C. 2001); see also F.D.I.C. ex rel. Coop. Bank v. Rippy, 799 F.3d 301, 314-15 (4th Cir. 2015) (explaining that "to the extent the enactment of N.C.G.S. § 1D-5(7) signaled the abrogation of the common law definition of gross negligence, it did so only in the context of cases where a plaintiff seeks punitive damages"). Gross negligence is "'wanton conduct done with conscious or reckless disregard for the rights and safety of others.'" Yancey, 550 S.E.2d at 157 (quoting Bullins v. Schmidt, 369 S.E.2d 601, 603 (N.C. 1988)). Wanton conduct "'is done of wicked purpose, or when done needlessly, [it] manifest[s] a reckless indifference to the rights of others.'" Id. (quoting Foster v. Hyman, 148 S.E. 36, 37-38 (N.C. 1929)). Gross negligence involves "intentional wrongdoing or deliberate misconduct affecting the safety of others." Id. at 158.

Plaintiffs allege that Colonial's "pattern and practice rising to the level of gross negligence and reckless and willful conduct is evidenced by the historical incidents" of leaks, releases, and ruptures along the pipeline dating back to 1970. (Compl. ¶ 151 (referring to allegations in paragraphs 107 through 137 of the Complaint).) Plaintiffs specifically identify the 1996 spill of nearly one million gallons of fuel oil in South Carolina, the 1997 spill of approximately 18,900 gallons of gasoline in Georgia, and the 1999 leak of approximately 53,550 gallons of fuel oil into the Tennessee River. (Id.) However, to the extent these allegations are not barred by the statute of repose, they are insufficient to support a gross negligence

23

claim because they do not support a reasonable inference that Colonial consciously or recklessly disregarded Plaintiffs' safety.

The 1996 diesel fuel spill in South Carolina not only occurred nearly twenty years prior to the April 2013 release, but it involved a ruptured pipeline near Fork Shoals, South Carolina. (Id. ¶ 112.)  The 1997 gasoline spill in Georgia not only occurred over fifteen years prior to the April 2013 release, but it "resulted from [Colonial's] own calculation error and it did not have a procedure in place to confirm such calculations." (Id. ¶ 115.)  The 1999 fuel oil release not only occurred nearly fifteen years prior to the April 2013 release, but, at the time it occurred, Colonial had information of a pressure reduction indicating a leak but nevertheless continued to send fuel into the pipeline. (Id. ¶ 117.)  In contrast, the release at issue here occurred at a booster station in Lexington, North Carolina in April 2013 as a result of a failed hydraulic line.  There is no similarity among the specific incidents upon which Colonial relies to support its gross negligence claim, nor does any more relevant picture develop from the other historical incidents.

There are past incidents at other pump or booster stations – a 1991 pipeline rupture at the Simpsonville, South Carolina pump station, a 1995 release at the Kannapolis, North Carolina booster station, a 2000 release from a crack in the half-inch line at the Kannapolis, North Carolina booster station, and a 2015 release at the Kannapolis, North Carolina booster station when an above-ground gasket on the discharge valve failed. (Id. ¶¶ 108, 111, 119, 122.)  However, three of those releases are decades old; one occurred years after the April 2013 release; the

24

causes of two of the releases are not alleged; and the half-inch line crack in 2000 and failed gasket in 2015 are dissimilar from the failed hydraulic line at issue here. The other historical incidents involve ruptured pipelines, (id. ¶¶ 109, 110, 112, 113), releases, many of which are unexplained, (id. ¶¶ 114, 118, 120, 121), and leaks, (id. ¶ 116), dating back to 1970 in Maryland, South Carolina, Texas, North Carolina, and Louisiana, while the other equally dissimilar incidents post-date the April 2013 release. These historical incidents are distinct in time, place, and features from the April 2013 release.

The four previous releases at the Lexington Booster Station provide no further support other than their location, because there are no facts alleged describing those releases, their causes, or their dates. Plaintiffs do allege that booster stations "contain intricate equipment" that requires "continuous investment of time and resources" to prevent the equipment from "break[ing] down and leak[ing]." (Id. ¶ 46.) These stations "have a greater danger of incurring mechanical damage and operator error" than "other parts of the pipeline". (Id. ¶ 49.) In particular, "North Carolina booster stations are subjected to strenuous engineering demands to ensure product momentum." (Id. ¶ 47.) Furthermore, "[d]uring all the years of [the Lexington Booster Station's] operation, [Colonial] has been well aware of the nearby presence of families and owners of private property." (Id. ¶ 71.) As for the April 2013 release itself, though, there is no allegation of the cause of the hydraulic line failure, much less any allegation to suggest plausibly that it resulted from any intentional or reckless act by Colonial.

25

The environmental damage caused by the historical incidents and the April 2013 release may be consistent with Colonial's liability to the extent it is not barred by the statute of repose. However, such allegations are insufficient to support a claim of gross negligence because Plaintiffs have not plausibly alleged that Colonial acted with conscious disregard of the safety of others.

E.

Next, Colonial argues that Plaintiffs' claim for punitive damages fails because they have not sufficiently alleged any of the necessary aggravating factors or that Colonial's officers, directors, or managers participated in or condoned such conduct as is required for corporate liability for punitive damages. (Def.'s Br. in Supp. at 13-14.) Plaintiffs respond by directing attention to their allegations that Colonial knew of the contamination levels, the residential properties affected by migrating contamination, and dangers from past incidents that were not remediated.[8] (Pls.' Br. in Opp'n at 21-22.) They also rely on Colonial's failure to submit requisite reports, receipt of a Notice of Violation for failure to take appropriate actions, and failure "to delineate the contamination plume". (Id.) They do not address Colonial's contention that they failed to allege facts supporting corporate liability. (See generally id.)

---

[8] Plaintiffs also cite to paragraph 70 of the Complaint for the statement that Colonial "had actual knowledge that nine water supply wells were within 1,500 feet from the source of the release", but, as noted earlier, they do not allege Colonial's knowledge of the wells' presence. Instead, they merely allege the wells' presence within 1,500 feet of the source of the release.

"Punitive damages may be awarded . . . to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1.  Pursuant to N.C. Gen. Stat. § 1D-15(a), punitive damages may be awarded if the defendant is liable for compensatory damages, the defendant engaged in fraud, malice, or willful or wanton conduct, and such conduct is related to the injury for which compensatory damages were awarded.  As is relevant here, the statute defines "willful or wanton conduct" as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm", and, as the term applies to punitive damages, it "means more than gross negligence." N.C. Gen. Stat. § 1D-5(7).

"Punitive damages may be awarded against . . . a corporation [only if] the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C. Gen. Stat. § 1D-15(c).  In addition, a corporation's acts or policies may constitute the aggravating factor and create liability for punitive damages. Everhart v. O'Charley's, Inc., 683 S.E.2d 728, 737 (N.C. Ct. App. 2009) (finding sufficient evidence to support the jury's finding that the restaurant manager's pursuit of the company's policy constituted willful and wanton conduct leading to punitive damages).

As Colonial recognizes in its Reply Brief, Plaintiffs' failure to respond to Colonial's argument that they alleged no facts supporting corporate liability is fatal. "Courts have recognized that a party's failure to address an issue in its opposition brief concedes the issue." Oliver v. Baity, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016) (citing cases). This District's Local Rules provide that when a party fails to respond timely to a motion, "the motion will be considered and decided" as "uncontested" and "ordinarily . . . granted without further notice." L. Civ. R. 7.3(k). Although Plaintiffs timely responded to Colonial's motion, they did so with respect to each of its challenges except its argument that Plaintiffs' did not refer to any officer, director, or manager of Colonial, much less allege that such a person participated in or condoned the conduct constituting the aggravating factor. As such, Plaintiffs have effectively conceded this issue. Nevertheless, had they responded in opposition to Colonial's argument, they would not have been successful, as Colonial's observation of the Complaint's deficiencies is accurate. Furthermore, there are no references to any company policy that would constitute the requisite aggravating factor. Accordingly, Plaintiffs have failed to state a claim for punitive damages against Colonial.

Even if Plaintiffs had sufficiently alleged facts to support corporate liability, they have not sufficiently alleged facts in support of willful and wanton conduct on the part of Colonial. Their failure to allege sufficient facts in support of their gross negligence claim dooms their punitive damages claim. Furthermore, their allegations specific to punitive damages do not otherwise save the claim. In

addition to repeated conclusory allegations describing acts as willful and wanton[9],

(Compl. ¶¶ 177-81), Plaintiffs again allege Colonial's knowledge of the dangers to

individuals similarly situated to Plaintiffs due to the historical incidents on its

pipeline and its failure to invest resources to end the "recurrent events", to prevent

emissions from the Lexington Booster Station despite historical incidents on its

pipeline, to remediate and monitor releases, to notify property owners of releases

and contamination, and to detect releases and report them to the NCDEQ. (Id.

¶ 180(a)-(c).)  Plaintiffs then repeat earlier allegations, but describe the conduct as

callous and deliberate:  Colonial "[c]allously and deliberately engag[ed] in delayed,

inadequate and woefully insufficient efforts to correct the harm to Plaintiffs'

homesteads" and "[c]allously and deliberately refus[ed] to cooperate in taking

steps to protect Plaintiffs[] and alleviate the harm such as timely and adequately

providing notice of contamination and its affects [sic] it has on their properties".

(Id. ¶ 180(d)-(e).)  These common refrains from the Complaint are insufficient to

support a claim for punitive damages.

III.

For the reasons stated in this Memorandum Opinion, IT IS HEREBY

ORDERED that Defendant Colonial Pipeline Company's Motion to Dismiss, [Doc.

#15], is GRANTED IN PART AND DENIED IN PART.  IT IS GRANTED as to

---

[9] In paragraph 178, Plaintiffs include the descriptor "malicious" which is among the aggravating factors supporting punitive damages.  However, nowhere else do Plaintiffs mention malice.  Instead, they repeatedly refer to and rely upon allegations of (and arguments about) willful and wanton conduct.

Plaintiffs' claims for willful and reckless conduct (part of Second Claim for Relief), strict liability (Fifth Claim for Relief), punitive damages (Sixth Claim for Relief), and all other claims to the extent that they rely on releases occurring on or before June 20, 2004.  IT IS DENIED as to all other claims to the extent that they rely on releases occurring after June 20, 2004.

This the 5th day of June, 2019.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge